Approved: _____
                KATHERINE REILLY
                Assistant United States Attorney

Before:   THE HONORABLE KATHARINE H. PARKER
                United States Magistrate Judge **18 MAG 9091**
                Southern District of New York

- - - - - - - - - - - - - - - X
                                         :
UNITED STATES OF AMERICA    :        *AMENDED*
                                         :        SEALED COMPLAINT
                                         :
          - v. -                       :        Violation of
                                         :        18 U.S.C §§ 1343 and 2.
DAVID SMOTHERMON,           :
                                         :
                    Defendant.       :        COUNTY OF OFFENSE:
                                         :        NEW YORK
- - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

        ANGELA TASSONE, being duly sworn, deposes and says that she
is a Special Agent with the Federal Bureau of Investigation
("FBI") and charges as follows:

COUNT ONE
(Wire Fraud)

        1.    From at least in or about December 2015, up to and
including at least in or about September 2016, in the Southern
District of New York and elsewhere, DAVID SMOTHERMON, the
defendant, willfully and knowingly, having devised and intending
to devise a scheme and artifice to defraud, and for obtaining
money and property by means of false and fraudulent pretenses,
representations, and promises, did transmit and cause to be
transmitted by means of wire, radio, and television
communication in interstate and foreign commerce, writings,
signs, signals, pictures, and sounds for the purpose of
executing such scheme and artifice, to wit, SMOTHERMON caused
false entries to be made in an accounting system utilized by the
financial firm for which he worked, leading the firm to
substantially overvalue various positions it held, and in
connection therewith and in furtherance thereof, caused to be

transmitted interstate e-mails transmitting the false entries
and overstated valuations.

(Title 18, United States Code, Sections 1343 and 2.)

The bases for my knowledge and the foregoing charges are,
in part, as follows:

2.    I am a Special Agent with the FBI.  I am currently
assigned to a squad responsible for investigating wire fraud,
bank fraud, securities fraud, money laundering, and other white-
collar offenses.  I am familiar with the facts and circumstances
set forth below from my personal participation in the
investigation, including my examination of reports and records,
interviews I have conducted, and conversations with other law
enforcement officers and other individuals.  Because this
affidavit is being submitted for the limited purpose of
establishing probable cause, it does not include all the facts
that I have learned during the course of my investigation.
Where the contents of documents and the actions, statements and
conversations of others are reported herein, they are reported
in substance and in part, unless noted otherwise.

                    Overview of the Fraud

3.    As set forth in further detail below, from at least in
or about December 2015 up to and including in or about September
2016, DAVID SMOTHERMON, the defendant, caused false entries to
be entered into an electronic accounting system in an effort to
hide from his employèr, a privately owned commodities trading
firm ("Company-1"), substantial trading losses generated by a
subsidiary, run by SMOTHERMON, specializing in the trading of
liquefied petroleum gas or "LPG" (the "Gas Subsidiary").
SMOTHERMON caused these false entries to be made in an effort to
retain his job and the significant compensation due to him in
connection with his employment.  As a result of the false
entries made at SMOTHERMON's direction, Company-1 overestimated
the division's potential profits by in excess of approximately
$35 million.

          The Operations of Company-1 and the Gas Subsidiary

4.    In the course of this investigation, I have spoken to
senior executives of Company-1 and have reviewed both publicly
available documents and documents and records produced by
Company-1.  Based on those conversations and that review, I am

                              2

aware of the following information, in substance and in part, regarding the operations of Company-1:

    a.  Company-1 is engaged in the international marketing, distribution, and trading of commodities products. The headquarters of Company-1 is in New York, New York.

    b.  During the relevant period, Company-1 operated a subsidiary specializing in the trading of liquefied petroleum gas or "LPG" (the "Gas Subsidiary").  The Gas Subsidiary was located in Houston, Texas.

    c.  DAVID SMOTHERMON, the defendant, was hired by Company-1 to work within the Gas Subsidiary in or about 2005. In or about 2012, SMOTHERMON was made the Chief Executive Officer of the Gas Subsidiary.  SMOTHERMON resigned from Company-1 in or about early September 2016.

    d.  While SMOTHERMON was CEO, the Gas Subsidiary primarily engaged in two forms of LPG trading: (1) entering into and executing contracts for the purchase and sale of barrels of LPG (the "Physical Trading"); and (2) the trading of financial derivative products related to LPG in an over-the-counter ("OTC") market (the "Financial Trading").

    e.  As CEO, SMOTHERMON's compensation included the awarding of an annual bonus based, in substantial part, on the performance of the Gas Subsidiary and the gains or losses generated by the Gas Subsidiary in the prior year.  Whether to award a bonus and in what amount was a discretionary determination made by members of the senior management of Company-1.  Bonuses for any given year were typically paid out in May of the following year.  In years in which any subsidiary of Company-1 incurred a loss, the bonus pool for that subsidiary for the following year would be reduced by the loss amount. Beginning in or about 2015, Company-1 deferred for three years payment of 20% of the bonus awarded to any employee receiving a bonus over $50,000 and awarded and additional 4% in "matching funds" to be paid out after three years had passed; if those employees left before the three years was complete, the deferred bonus amount was forfeited.

    5.  In the course of this investigation, I have spoken to several former employees of the Gas Subsidiary and have reviewed records and documents produced by Company-1.  Based on those conversations and that review, I am aware of the following information, in substance and in part, related to the operation

3

of the Gas Subsidiary between in or about 2015 and in or about 2016:

> a.   Only SMOTHERMON and another trader employed by the Gas Subsidiary ("Trader-1") engaged in Physical Trading and Financial Trading of LPG on behalf of the Gas Subsidiary. SMOTHERMON was the primary decision maker as to all Financial Trading.

> b.   Company-1, through the Gas Subsidiary, employed two individuals ("Employee-1" and "Employee-2,") who assisted in the recording of Physical Trading contracts, among other things. Company-1 also employed a Director of Accounting for the Gas Subsidiary ("Employee-3"), reporting to the Chief Accounting Officer of Company-1.

> c.   With regard to Physical Trading, when either SMOTHERMON or Trader-1 finalized a purchase or sale of LPG with a counterparty, they provided the terms of the deal to either Employee-1 or Employee-2.  Employee-1 or Employee-2 then prepared a written contract memorializing the terms of the deal and also entered the terms of the deal into Company-1's electronic accounting system (the "Accounting System").  Both Employee-1 and Employee-2 made changes in the Accounting System to the terms of a Physical Trading deal only at the direction of SMOTHERMON or Trader-1.  Neither SMOTHERMON nor Trader-1 had access to the Accounting System.

> d.   With regard to Financial Trading, when either SMOTHERMON or Trader-1 finalized a trade of a financial product, they notified Employee-1 or Employee-2 of the terms of the trade, and Employee-1 or Employee-2 verified those terms against a confirmation statement provided by a broker.  Employee-1 or Employee-2 also entered the terms of the trade into the Accounting System.

> e.   According to the practices and procedures employed by Company-1, the Gas Subsidiary was supposed to prepare a "position report" for the Gas Subsidiary each day, to be sent by e-mail from Employee-3, in Houston, to senior members of the accounting function of Company-1, located in New York, New York.  While Employee-3 often prepared and sent these reports, he did not do so every day, sometimes sending an e-mail indicating that there was no report that day or no change in the positions.  When Employee-3 did send the position reports, they were several hundred pages long and listed all of the Gas Subsidiary's positions as a result of both Financial Trading and

4

Physical Trading.  Employee-3 included with the position reports a summary of the positions held by the Gas Subsidiary.

               i.    In order to assist in the preparation of the daily position report, Employee-1 ran a report out of the Accounting System detailing the Physical Trading and Financial Trading positions held by the Gas Subsidiary at any given time.  SMOTHERMON reviewed the report and made corrections as to pricing as necessary, often by hand.  Employee-1 reviewed the report for errors as to volume for only certain of the positions.

              ii.    Once SMOTHERMON and/or Employee-1 had signed off, Employee-3 generated the position report in the Accounting System and sent it by e-mail to Company-1 executives in New York, New York.

### The Performance of the Gas Subsidiary

     6.    In the course of this investigation, I have spoken to several former employees of the Gas Subsidiary and have reviewed records and documents produced by Company-1.  Based on those conversations and that review, I am aware of the following information, in substance and in part, related to the financial performance of the Gas Subsidiary between in or about 2015 and in or about September 2016:

              a.    In or about 2015, DAVID SMOTHERMON, the defendant, had a particularly successful year with regard to the Financial Trading in which he was engaged.  As a result, the size of the Gas Subsidiary's Financial Trading book increased substantially over the course of 2015 and into 2016.

              b.    Despite the success of SMOTHERMON's 2015 trading, beginning in or about late 2015 and early 2016, Company-1 executives expressed concern to SMOTHERMON about the size of the Gas Subsidiary's Financial Trading positions.  In addition, in or about March 2016, Company-1 executives began learning of substantial margin calls on Company-1 based on the Financial Trading of the Gas Subsidiary.  These margin calls did not appear to executives of Company-1 to be consistent with the Financial Trading activity presented in the position reports provided to them by the Gas Subsidiary.

c.    Beginning in or about May 2016, SMOTHERMON began having communications with the CFO regarding the allocation of a bonus pool to be distributed to employees of the Gas Subsidiary, including SMOTHERMON.

d.    In or about May 2016, based on the performance of the Gas Subsidiary in 2015, driven in large part by SMOTHERMON's Financial Trading, SMOTHERMON was awarded a bonus of approximately $14.5 million.  Consistent with Company-1's practices, SMOTHERMON was paid approximately $11.3 million in or about May 2016; an additional approximately $3.48 million, which included an additional contribution from Company-1 to "match" the deferred bonus funds—was set aside for SMOTHERMON as a deferred bonus.  SMOTHERMON was also appointed to the Board of Directors of Company-1.

e.    As a result of these issues, throughout the spring and summer of 2016, SMOTHERMON engaged in increasingly frequent communication with Company-1 executives about the profit and loss attributable to the Gas Subsidiary.  Beginning in or about the spring of 2016, SMOTHERMON had discussions with various Company-1 executives in which he indicated, in substance and in part, that the Financial Trading book held by the Gas Subsidiary had broken even for the first three months of the year and would be down approximately $5 million or $6 million in the second quarter of the year.  As time went on, SMOTHERMON repeatedly reassured Company-1 executives in e-mail and telephone communications that he was working to reduce the size of Company-1's Financial Trading book and to manage and minimize losses sustained by the Gas Subsidiary.

i.    For example, on or about July 13, 2016, Employee-3 e-mailed the daily position report to several senior executives of Company-1, as well as to SMOTHERMON and Trader-1, noting that the report showed a loss for that day of $36,000. On or about the following day, SMOTHERMON replied, in substance and in part, that he believed the market conditions were a result of overbuying by Chinese purchasers and were "most likely a temporary situation" but that the Gas Subsidiary would "scale things back while we wait and see if the international end users continue to have their needs met by non USGC propane."

ii.    On or about July 19, 2016, the Chief Financial Officer of Company-1 (the "CFO") e-mailed SMOTHERMON, writing, in substance and in part, that he wanted "to make sure you are hanging in there during this rough patch for the entire industry."  SMOTHERMON responded, in substance and in part, that

"[t]hings have definitely been a challenge and I am working hard to understand all the implications of this dynamic market." He added, in substance and in part, that he was "scaling back the core position" and "still feel as though things will change by the end of 3Q but it could be a tough stretch in the short term."

<h2 style="text-align:center">The False Entries</h2>

7.   In the course of this investigation, I have spoken to current and former employees of the Gas Subsidiary and Company-1 and have reviewed records and documents produced by Company-1. Based on those conversations and that review, I am aware of the following information, in substance and in part, related to the recording of Physical Trading by the Gas Subsidiary in or about 2016:

a.   On multiple occasions in 2016, examples of which are set forth below, DAVID SMOTHERMON, the defendant, directed Employee-1 and Employee-2 to make erroneous changes to the terms of Physical Trading deals in the Accounting System. As a result of these false entries, the Accounting System, and the daily position reports provided to Company-1 executives, showed that the Gas Subsidiary was due to earn substantially more money than it was actually due to earn under the true terms of the Physical Trading contracts. Indeed, as a result of the false entries, the Accounting System and daily position reports overestimated the potential profits of the Gas Subsidiary by more than approximately $35 million.

b.   On or about March 8, 2016, SMOTHERMON entered into a contract on behalf of the Gas Subsidiary with a counterparty ("Counterparty-1"), under which the Gas Subsidiary agreed to purchase 40,000 metric tons of LPG from Counterparty-1 at a floating market price, with delivery of 20,000 metric tons of LPG to be made before on or about October 31, 2016 and the remainder to be delivered in or about the second half of January 2017 (the "March 8 Contract"). The terms of the March 8 Contract with Counterparty-1 were never altered or amended.

i.      On or about March 9, 2016, Employee-2 entered the March 8 Contract into the Accounting System, recording each of the two contracted deliveries as a separate contract for the purchase of 10,500,000 gallons of LPG (or approximately 20,154 metric tons of LPG) by the Gas Subsidiary from Counterparty-1 at a floating market price.

ii.     On or about August 1, 2016, SMOTHERMON used the "Notes" function in the e-mail program Outlook to write a note reminding himself to, in substance and in part, "Double Jan cargo w/[Counterparty-1] to 40kt[.]"

iii.     Also on or about August 1, 2016, SMOTHERMON gave Employee-2 a note written in his handwriting (the "Note") indicating among other things, the contract number used to identify the January 2017 delivery of the March 8 Contract in the Accounting system next to a notation "21,000,000 gals[.]" As a result of being given this note, Employee-2 made a change in the Accounting System to the entry regarding the January 2017 delivery of the March 8 Contract, doubling the volume to be purchased by Company-1 to 21,000,000 gallons of LPG(or approximately 40,307 metric tons).

iv.     As a result of the change made in the Accounting System by Employee-2, the Accounting System reflected that March 8 Contract was for the Gas Subsidiary to purchase substantially more LPG than the March 8 Contract actually called for.  As a result, the Accounting System and the subsequent daily positon reports generated from the Accounting System overestimated the gains to be made by the Gas Subsidiary on the March 8 Contract by approximately $2,100,000.

v.     On two occasions after Employee-2 made this change at SMOTHERMON's direction, SMOTHERMON wrote himself additional notes in Outlook regarding the March 8 Contract.  On or about August 1, 2016, SMOTHERMON wrote a note reminding himself to, in substance and in part, "Double Jan cargo w/[Counterparty-1] to 40kt[.]"  On or about August 15, 2016, SMOTHERMON wrote a note reminding himself to, in substance and in part, "Revise [Counterparty-1] Cargo down to 20kt[.]"  These changes were not made in the Accounting System.  Based on my involvement in this investigation, I believe that these notes were designed to remind SMOTHERMON to correct the false entries in the Accounting System before they could be discovered, for example, because the contract needed to be executed under the correct terms.

c.  On or about July 14, 2016, Trader-1 entered into a contract on behalf of the Gas Subsidiary with a counterparty ("Counterparty-2"), under which the Gas Subsidiary agreed to purchase 66,000 metric tons of LPG at a floating market price (the "July 14 Contract").  The July 14 Contract called for the LPG to be delivered in two shipments, the first between in or about April 1, 2017 and in or about June 30, 2017 and the second

between in or about December 1, 2017 and between in or about
February 28, 2018.   The terms of the July 14 Contract were never
altered or amended.

         i.      On or about July 14, 2016, Employee-1
entered the July 14 Contract into the Accounting System, noting
that the contract was for the purchase of 34,372,800 gallons
(approximately 65,975 metric tons) of LPG at a floating price.
On or about the same day, Employee-1 changed the price entered
in the Accounting System from a floating price to a fixed price
of $0.58 per barrel.

        ii.     On multiple occasions between on or about
July 26, 2016 and on or about August 5, 2016, Employee-1 and
Employee-2 made changes in the Accounting System as to the price
at which the Gas Subsidiary was, purportedly, to purchase LPG
from Counterparty-2.   On or about July 26, 2016, Employee-1
lowered the price to $0.48 per barrel.   On or about August 3,
2016, Employee-2 further lowered the price to $0.43 per barrel.

        iii.    On or about August 1, 2016, SMOTHERMON used
the "Notes" function in the e-mail program Outlook to write a
note reminding himself to, in substance and in part, "Double
cal18 cargo with [Counterparty-2] to 132kt."   Also on or about
August 1, 2016, SMOTHERMON gave Employee-2 the Note, which
indicated, among other things, the contract number used to
identify the July 14 Contract in the Accounting system above a
notation "68,745,600 gals[.]" As a result of being given the
Note, on or about August 3, 2016, Employee-2 made a change in
the Accounting System to the entry regarding the July 14
Contract, doubling the volume to be purchased by Company-1 to
68,745,600 gallons of LPG (or approximately 131,949 metric
tons).

        iv.     As a result of the changes made in the
Accounting System by Employee-1 and Employee-2, the Accounting
System reflected that the July 14 Contract was for the Gas
Subsidiary to purchase substantially more LPG at a lower price
than that actually called for by the July 14 Contract.   As a
result, the Accounting System and the daily positon reports
generated from the Accounting System overestimated the gains to
be made by the Gas Subsidiary on the July 14 Contract by
approximately $19,300,000.

        d.  On or about November 13, 2015, SMOTHERMON entered
into a contract on behalf of the Gas Subsidiary with a
counterparty ("Counterparty-3"), under which the Gas Subsidiary

agreed to sell to Counterparty-3 150,000 barrels of LPG per month every month between January 1, 2017 and December 31, 2017 at a price of approximately $0.435 per barrel (the "November 13 Contract"). The terms of the November 13 Contract were never altered or amended.

    i.  On or about November 13, 2015, Employee-2 entered the November 13 Contract into the Accounting System, noting that the contract was for the sale of LPG in multiple shipments at a fixed price of $0.435 per barrel.

    ii.  On or about August 1, 2016, Employee-2 changed the price entered in the Accounting System for several shipments due under the November 13 Contract to $0.535 per barrel.

    iii.  As a result of the changes made in the Accounting System by Employee-2, the Accounting System reflected that the November 13 Contract was for the Gas Subsidiary to sell LPG at a higher price than the November 13 Contract actually called for; as a result, the Accounting System (and the subsequent daily positon reports generated from the Accounting System) overestimated the gains to be made by the Gas Subsidiary on the November 13 Contract by approximately $5,670,000.

    e. On or about March 31, 2016, SMOTHERMON entered into two contracts on behalf of the Gas Subsidiary with Counterparty-3 (collectively, the "March 31 Contracts"). Under the first contract, the Gas Subsidiary agreed to sell to Counterparty-3 75,000 barrels of LPG per month every month between January 1, 2017 and December 31, 2017 at a price of approximately $0.55875 per barrel (the "First March 31 Contract"). Under the second contract, the Gas Subsidiary agreed to sell to Counterparty-3 125,000 barrels of LPG per month every month between January 1, 2017 and December 31, 2017 at a price of approximately $0.55875 per barrel (the "Second March 31 Contract"). The terms of the March 31 Contracts were not altered or amended after the deals were reached.

i.   On or about March 31, 2016, Employee-1 entered the March 31 Contracts into the Accounting System, noting that the contract was for the sale of LPG in multiple shipments at a fixed price of $0.5588 per barrel.

ii. On or about August 1, 2016, Employee-2 changed the prices entered in the Accounting System for several shipments of the March 31 Contracts to $0.6587 per barrel.

iii. As a result of the changes made in the Accounting System by Employee-2, the Accounting System reflected that the March 31 Contracts were for the Gas Subsidiary to sell LPG at a higher price than that actually called for; as a result, the Accounting System (and the subsequent daily position reports generated from the Accounting System) overestimated the gains to be made by the Gas Subsidiary on the March 31 Contracts by approximately $7,560,000.

### The Discovery of the Fraud

8.    In the course of this investigation, I have spoken to several current and former employees of the Gas Subsidiary and Company-1 and have reviewed records and documents produced by Company-1.  Based on those conversations and that review, I am aware of the following information, in substance and in part, related to the resignation of DAVID SMOTHERMON, the defendant, from Company-1:

a.   On or about August 24, 2016, the CFO e-mailed SMOTHERMON, writing, in substance and in part, that he had learned from individuals in Company-1's accounting function that they had noticed a discrepancy between a price listed on a contract for the purchase of LPG from Counterparty-2 and the price recorded in the Accounting System, which resulted in an overstatement of potential profits to Company-1 in the Accounting System.  The CFO further noted, in substance and in part, that "[t]his is a good time for you to review all prices on open physical contracts (buys and sells) in [the Accounting System] with Accounting to make sure there is no other pricing errors in the book at this time."  SMOTHERMON responded, in substance and in part, that he would "review all prices and get any discrepancies ironed out."

11

b.  As a result of the discrepancy identified by
Company-1's accounting function, in or about late August 2016,
Company-1 executives requested that the Gas Subsidiary collect
and transmit all Physical Trading contracts to Company-1's New
York, New York headquarters to review.  Company-1 executives
also began to discuss, including with those working in the Gas
Subsidiary's office in Houston, Texas, conducting an audit of
the Gas Subsidiary.

c.  On or about September 1, 2016, SMOTHERMON did not
report for work at the Gas Subsidiary.  On or about the same
day, SMOTHERMON called the CFO, telling the CFO, in substance
and in part, that the situation at the Gas Subsidiary was
"really bad" and that he was checking himself into a substance
abuse rehabilitation facility.  When the CFO asked SMOTHERMON if
he had mismarked the Gas Subsidiary's book, SMOTHERMON replied
that he had.  Also on or about September 1, 2016, SMOTHERMON
exchanged text messages with Trader-1 in which Trader-1 asked
SMOTHERMON, in substance and in part, "how bad is the book?"
SMOTHERMON replied, in substance and in part, "[h]onestly, I
don't even know if I know at this point[.]  Probably close to ~
$90mil maybe[.]"

d.  Following SMOTHERMON's resignation, senior
executives of Company-1 directed a review of the Physical Trading
contracts on the Gas Subsidiary's books.  The review unearthed
the false entries in the Accounting System described above, among
others, and revealed that the changes entered into the Accounting
System at SMOTHERMON's direction with regard to Physical Trading
contracts resulted in an overestimation of profits due to the Gas
Subsidiary in excess of $35 million.

e.  The review also found that SMOTHERMON's
determinations as to the mark-to-market value of the Gas
Subsidiary's Financial Trading positions, when compared to values
set forth by third parties, overestimated the value of those
position by in excess of approximately $100 million.
SMOTHERMON's determinations were also inconsistent with the same
product being priced differently depending on what position the
Gas Subsidiary held on a given day.

f.  The difference between the reported valuations
and the corrected valuations was so substantial that if the
senior executives of Company-1 had understood the size of the
losses incurred by the Gas Subsidiary at the time SMOTHERMON was

paid approximately $11 million of his bonus in May 2016, Company-1 would not have paid SMOTHERMON that portion of his bonus.

g.  As a result of these findings, Company-1 liquidated the Gas Subsidiary's Financial Trading positions at a substantial loss.  Because of the losses incurred, and the resulting loss of access to credit by Company-1, between in or about September 2016 and in or about July 2017, Company-1 shut down the Gas Subsidiary and laid off more than 200 employees throughout its various divisions.

WHEREFORE, deponent prays that an arrest warrant be issued for DAVID SMOTHERMON, the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

ANGELA TASSONE
Special Agent
Federal Bureau of Investigation

Sworn to before me this
25th day of October, 2018

THE HONORABLE KATHARINE H. PARKER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

13