# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

- v. -

DAVID SMOTHERMON,

*Defendant*.

Case No. 19 Cr. 382 (AKH)

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
## MOTION TO DISMISS THE INDICTMENT

Alexandra A.E. Shapiro
Daniel J. O'Neill
Avery D. Medjuck
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas, 17th Floor
New York, New York 10036
(212) 257-4880

George D. Murphy, Jr.
GEORGE D. MURPHY, JR.
1001 Fannin, Suite 2450
Houston, Texas 77002
(713) 658-1960

Terry W. Yates
YATES AND ASSOCIATES
2502 Algerian Way
Houston, Texas 77098
(713) 861-3100

*Attorneys for Defendant David Smothermon*

## **TABLE OF CONTENTS**

**Page**

TABLE OF AFFIDAVITS AND EXHIBITS ................................................................. ii

TABLE OF AUTHORITIES .................................................................................... iii

INTRODUCTION ................................................................................................. 1

FACTUAL BACKGROUND ..................................................................................... 2

    A.  Introduction ................................................................................... 2

    B.  The Government's Shifting Fraud Allegations ........................................... 4

        1.  The Complaint............................................................................. 4

        2.  The Indictment And *Ciminelli v. United States* ..................................... 5

        3.  The Superseding Indictment ............................................................ 6

ARGUMENT ...................................................................................................... 7

  I.  THE S-1 SHOULD BE DISMISSED FOR FAILURE TO SUFFICIENTLY
ALLEGE A SCHEME TO OBTAIN MONEY OR PROPERTY ................................... 7

    A.  Legal Standard................................................................................ 7

    B.  Wire Fraud Requires A Scheme To Obtain Money Or Property.................... 8

    C.  The Government's "Discretionary Bonus" Allegation Fails To Satisfy The
"Obtaining Property" Element Of Wire Fraud.......................................... 9

    D.  The Government's "Discretionary Bonus" Theory Is Fatally Undermined
By Its Own Allegations .................................................................... 15

  II.  THE S-1 DOES NOT RELATE BACK TO THE FILING OF THE ORIGINAL
INDICTMENT AND IS THEREFORE UNTIMELY.................................................. 16

    A.  Legal Standard.............................................................................. 17

    B.  The Elements Of The Traditional Property Fraud Alleged In The S-1
Materially Differ From The Original Indictment's Right-To-Control Theory ......... 17

    C.  The Government's New Theory Of Fraud Will Require New Evidence And
Necessitate New Defenses ................................................................ 18

  III.  IN THE ALTERNATIVE, THE CASE SHOULD BE ADJOURNED
PENDING THE SUPREME COURT'S DECISION IN *KOUSISIS* .............................. 21

CONCLUSION.................................................................................................... 23

## TABLE OF AFFIDAVITS AND EXHIBITS
(Pursuant to Individual Rule 2(C))

**Declaration of George D. Murphy, Jr.**

Exhibit A:  GX701 - Microsoft Outlook Note dated August 1 , 2016

Exhibit B:  GX702 - Microsoft Outlook Note dated August 13, 2016

Exhibit C:  GX703 - Microsoft Outlook Note dated August 15, 2016

Exhibit D:  GX704 - Microsoft Outlook Note dated August 30, 2016

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                    **Page(s)**

*Ciminelli v. United States,*
    598 U.S. 306 (2023) ........................................................................................... passim

*Cleveland v. United States,*
    531 U.S. 12 (2000) ............................................................................................ 12, 13

*Kelly v. United States,*
    590 U.S. 391 (2020) ......................................................................................... 8, 9, 13

*Kousisis v. United States,*
    No. 23-909 (U.S. June 17, 2024) ...................................................................... passim

*McNally v. United States,*
    483 U.S. 350 (1987) ...................................................................................... 8, 11, 13

*Skilling v. United States,*
    561 U.S. 358 (2010) ......................................................................................... 11, 13

*Snyder v. United States,*
    144 S. Ct. 1947 (2024) ........................................................................................... 12

*United States v. Aleynikov,*
    676 F.3d 71 (2d Cir. 2012) ....................................................................................... 7

*United States v. Ben Zvi,*
    168 F.3d 49 (2d Cir. 1999) ................................................................................ passim

*United States v. Finazzo,*
    850 F.3d 94 (2d Cir. 2017) ....................................................................................... 9

*United States v. Gengo,*
    808 F.2d 1 (2d Cir. 1986) ........................................................................................ 21

*United States v. Goodrich,*
    871 F.2d 1011 (11th Cir. 1989) ......................................................................... 10, 11

*United States v. Guertin,*
    581 F. Supp. 3d 90 (D.D.C. 2022) ............................................................... 10, 11, 12

*United States v. Guertin,*
    67 F.4th 445 (D.C. Cir. 2023) ....................................................................... 7, 12, 15

*United States v. Italiano,*
    894 F.2d 1280 (11th Cir. 1990) .............................................................................. 18

*United States v. Kousisis*,
    82 F.4th 230 (3d Cir. 2023) ............................................................................ 21, 22

*United States v. Ochs*,
    842 F.2d 515 (1st Cir. 1988) .................................................................................. 11

*United States v. Panebianco*,
    543 F.2d 447 (2d Cir. 1976) ................................................................................... 21

*United States v. Pirro*,
    212 F.3d 86 (2d Cir. 2000) ....................................................................................... 8

*United States v. Salmonese*,
    352 F.3d 608 (2d Cir. 2003) ............................................................................. 17, 18

*United States v. Serrano*,
    191 F. Supp. 3d 287 (S.D.N.Y. 2016) ..................................................................... 8

*United States v. Simpson*,
    No. 3:21-CR-00153, 2023 WL 6247268 (W.D. La. Sept. 25, 2023) ...................... 10

*United States v. Tao*,
    629 F. Supp. 3d 1083 (D. Kan. 2022) ............................................................. 10, 11

*United States v. Turner*,
    465 F.3d 667 (6th Cir. 2006) .......................................................................... 10, 11

*United States v. Yates*,
    16 F.4th 256 (9th Cir. 2021) ........................................................................... passim

*Van Buren v. United States*,
    593 U.S. 374 (2021) .............................................................................................. 12

## Statutes

18 U.S.C. § 1343 ............................................................................................... passim

18 U.S.C. § 1344 ........................................................................................................ 14

18 U.S.C. § 1346 ........................................................................................................ 11

18 U.S.C. § 3282 ........................................................................................................ 16

## INTRODUCTION

This wire fraud prosecution arises from an employment dispute.  The government alleges David Smothermon, a former trader at a private commodities company, caused false entries to be made in his company's accounting system eight years ago, in 2016.  But the government has never had any coherent theory of fraud.  Smothermon made no money from the fraud, and his company lost no money from the fraud.  The theory of the original indictment was that the alleged scheme deprived the company of its "right to control" its assets.  However, as the Supreme Court held last year, that is not a property interest protected by the wire fraud statute. *See Ciminelli v. United States*, 598 U.S. 306, 309 (2023).

The government should have agreed to dismiss the charge after *Ciminelli*, but instead it changed course and filed a superseding indictment purporting to allege a more "traditional" theory of property fraud.  The superseding indictment is equally defective.  It now alleges the object of the fraud was a "discretionary" bonus earned in *2015* and paid in early 2016.  Thus, the government's theory is that if an employee lies to his employer about his current performance, to avoid losing a benefit he previously earned, he has committed federal property fraud.  As numerous courts have held, however, this type of allegation does not establish the requisite scheme for "obtaining money or property" under 18 U.S.C. § 1343.  If it did, the government could easily end-run the limitations the Supreme Court has placed on honest services fraud by converting just about any deceit to one's employer into a federal fraud crime.  "The theory thus makes a federal crime of an almost limitless variety of deceptive actions traditionally left to state contract and tort law—in flat contradiction" of the Supreme Court's directive that courts should not interpret the fraud statutes "to place under federal superintendence a vast array of conduct traditionally policed by the States." *Ciminelli*, 598 U.S. at 315-16.  The superseding indictment does not state a valid theory of wire fraud and must be dismissed.

The superseding indictment also violates the five-year statute of limitations because the government has both "broadened" and "substantially amended" the charges. *United States v. Ben Zvi*, 168 F.3d 49, 54 (2d Cir. 1999). It has done so by alleging a fraud with a different object—now, the 2015 bonus instead of the company's "right to control" its assets—and by pursuing a new theory that will necessarily shift the evidentiary focus of the case from false accounting entries allegedly made *after* the bonus was paid in May 2016 to some time frame in 2016 before May. The superseding indictment therefore does not relate back to the original indictment and is untimely. This provides an independent basis for dismissal.

Alternatively, the Court should hold the case in abeyance pending the Supreme Court's resolution of *Kousisis v. United States*, No. 23-909, which presents a related question about the scope of the wire fraud statute.

## FACTUAL BACKGROUND

### A.    Introduction

David Smothermon is a self-made man who—straight out of college—put himself through night school to earn a master's degree in finance. From 2005 to 2016, Smothermon worked as a trader of liquified petroleum gas (LPG) products at the Houston office of a subsidiary of Trammo, Inc. (identified in the sworn criminal complaint as "Company-1"), a privately held international physical commodities company based in New York City. (Dkt. 3 ¶¶ 4(a)-(c)). While working at the gas subsidiary, Smothermon entered contracts for the delivery or sale of physical LPG and traded LPG derivative financial products. (*Id.* at ¶ 4(d)). Smothermon became the CEO of the Houston-based gas subsidiary in 2012. (*Id.* at ¶ 4(c)).

When Smothermon executed a trade, he would notify other Houston-based employees of the terms of the trade. One of those employees would then either (for physical LPG trades) prepare a contract memorializing the terms and enter the trade into Trammo's accounting system

or (for derivatives) simply confirm the terms and enter them into the accounting system. (*Id.* at ¶¶ 5(c)-(d)). Each day, another Houston-based employee would prepare a daily "position report" reflecting the positions of the gas subsidiary's trades and send the report to Trammo's accountants in New York. (*Id.* at ¶ 5(e)).

Smothermon's compensation was based, in substantial part, on the gas subsidiary's financial performance. (*Id.* at ¶ 4(e)). Bonuses for the prior year would typically be paid in May of the following year. (*Id.*). Smothermon's bonus was not based on subjective factors—it was based strictly on performance. Although the government has alleged that the bonus was "discretionary" (*id.*; *see also* Dkt. 96 ¶ 1), it does not allege that Trammo had any formal or informal "clawback" policy that it could use to seek the return of a bonus already paid or owing from a prior period based on subsequent trading losses.

Smothermon's trading for the gas subsidiary in 2015 was extraordinarily successful. (Dkt. 3 ¶ 6(a)). Based on that success, in May 2016 Smothermon was awarded a $14.5 million bonus for 2015, the majority of which was paid immediately, and a portion of which was (pursuant to company policy) deferred, to later be paid with an additional company "match." (*Id.* at ¶ 6(d)). The government has never alleged that Smothermon falsified the records of the gas subsidiary's 2015 trades.

Beginning in mid-2016 the LPG market became increasingly volatile, and Trammo faced margin calls based on the positions of the gas subsidiary. (*Id.* at ¶ 6(b)). In July 2016, Trammo's CFO wrote to Smothermon that he wanted "to make sure you are hanging in there during this rough patch for the entire industry." (*Id.* at ¶ 6(e)(ii)). The subsidiary incurred substantial trading losses between the spring and fall of 2016, and in September 2016 Smothermon resigned.

### B.    The Government's Shifting Fraud Allegations

#### 1.    The Complaint

On October 25, 2018, the government filed a sworn criminal complaint (Dkt. 1) and then

a substantively identical amended complaint (Dkt. 3), charging Smothermon with one count of

wire fraud in violation of 18 U.S.C. § 1343.  The amended complaint alleged that Smothermon

"caused false entries to be made in an accounting system utilized by [Trammo], leading the firm

to substantially overvalue various positions it held."  (Dkt. 3 at ¶ 1).

Specifically, the government alleged that in 2016, Smothermon directed other Houston-

based employees "to make erroneous changes to the terms of Physical Trading deals in the

Accounting System," and that these intentionally false entries "showed that the Gas Subsidiary

was due to earn substantially more money than it was actually due to earn under the true terms of

the Physical Trading contracts."  (*Id.* at ¶ 7(a)).  The government alleged that at Smothermon's

direction, employees mismarked LPG contracts to inflate the value of the subsidiary's trading

book.  It identified five supposedly inflated contracts.  Although the five contracts at issue were

*entered* between November 13, 2015 and July 14, 2016, the alleged *mismarking* identified by the

government occurred entirely in July and August 2016.  (*Id.* at ¶¶ 7(b)(iii); (c)(i-iii); (d)(ii);

(e)(ii).

The government alleged, in passing, that Trammo would not have given Smothermon his

bonus for 2015—which was announced and largely paid in May 2016—if it had known the true

state of the gas subsidiary's trading book in 2016.  (*Id.* at ¶ 8(f)).  But it did not allege that

Smothermon falsified the accounting records to obtain any money to which he was not already

entitled, *e.g.*, to increase his future *2016* bonus (which would be paid in May 2017).  Rather, the

government alleged that Smothermon "caused the[] false entries to be made in an effort to retain

his job and the significant compensation do to him in connection with his employment."  (*Id.* at ¶

4

3).  Moreover, as noted, the specific instances of mismarking identified by the government occurred *after* May 2016, when Smothermon received his bonus.

Rather than focus on Smothermon's intent, or his object for the alleged scheme, the government's allegations focused on the effect the charged scheme had on Trammo's assets. The complaint repeatedly alleged that Smothermon's scheme had caused Trammo to overestimate the LPG subsidiary's potential profits, resulting in a substantial loss to the company.  (*Id.* at ¶¶ 3; 7(a); 8(d) & (g)).

### 2.    The Indictment And Ciminelli v. United States

On May 23, 2019, the Grand Jury returned an indictment (Dkt. 25) charging Smothermon with one count of wire fraud.  The indictment consisted of a single factual allegation that tracked the text of the wire fraud statute, with a "to wit" clause echoing the now defunct right-to-control theory of fraud, under which "a defendant is guilty of wire fraud if he schemes to deprive the victim of potentially valuable economic information necessary to make discretionary economic decisions."  *Ciminelli*, 598 U.S. at 308.  It alleged that:

> SMOTHERMON devised and executed a scheme to defraud his employer, a financial firm ("Firm-1"), of its right to control its assets, and thereby exposed Firm-l to risk of economic harm, by causing false entries to be made in Firm-l's accounting system, leading Firm-1 to substantially overvalue various positions it held….

(*Id.* at ¶ 1).

After the Supreme Court granted certiorari in *Ciminelli* to decide the validity of the right-to-control theory, this Court granted the parties' joint request to adjourn trial pending the Supreme Court's decision.  (Dkt. 75).  On May 11, 2023, the Supreme Court unanimously held the right-to-control theory is invalid because it "cannot be squared with the text of the federal fraud statutes," is "inconsistent with the structure and history of the federal fraud statutes," and

"vastly expands federal jurisdiction without statutory authorization." *Ciminelli*, 598 U.S. at 314-15.

###### 3.    *The Superseding Indictment*

After *Ciminelli* invalidated the government's theory for prosecuting Smothermon, the parties engaged in months-long discussion of a potential resolution of the case. (*See* Dkts. 78, 82, 87, 89). No resolution was reached, and on May 14, 2024, the Grand Jury returned a superseding indictment (the S-1) again charging Smothermon with one count of wire fraud. (Dkt. 96).

The S-1, like the original indictment, contains only a single factual allegation that tracks the language of the wire fraud statute, with a short "to wit" clause. But instead of relying on the defunct right-to-control theory under which the object of the alleged fraud was depriving Trammo of information, the S-1 alleges that the object of Smothermon's alleged fraud was his 2015 bonus:

> SMOTHERMON concealed substantial losses in his trading book by causing false entries to be made in an accounting system used by the financial firm for which he worked and mismarking his trading positions, leading the firm to substantially overvalue various positions it held, in order to obtain a discretionary bonus to which he would not have been entitled.

(*Id.* at ¶ 1). Although the S-1 does not specify precisely which "discretionary bonus" is the supposed object of the alleged fraud, the government has confirmed that the "discretionary bonus" at issue is the 2015 bonus that Smothermon received in May 2016. (Declaration of George D. Murphy ("Murphy Decl.") ¶ 2).

## ARGUMENT

### I.    THE S-1 SHOULD BE DISMISSED FOR FAILURE TO SUFFICIENTLY ALLEGE A SCHEME TO OBTAIN MONEY OR PROPERTY

The government's clumsy effort to morph its right-to-control case against Smothermon into a "traditional" property fraud prosecution fails at the outset, because the government's allegations do not support a traditional theory of fraud, under which the defendant's deception must have as its object "obtaining money or property."  At most, the government's allegations support the theory that Smothermon deceived Trammo to maintain his *existing* salary and to ensure he received the bonus he had *already earned* based on his 2015 performance, before any alleged deception occurred.  But courts around the country have repeatedly rejected this "salary-maintenance" theory of fraud because it is inconsistent with the language of the federal fraud statutes and would threaten to bring any workplace deception within the ambit of the federal criminal law.  Thus, "[e]ven if we assume that [Smothermon's] untruths were part of a 'scheme,' the indictment here still fails because it does not plausibly allege that the purpose of [Smothermon's] scheme was to deprive [Trammo] of 'money or property,' as required by section 1343 and Supreme Court case law construing the statute."  *United States v. Guertin*, 67 F.4th 445, 449-50 (D.C. Cir. 2023) ("*Guertin II*").[1]

### A.    Legal Standard

"Since federal crimes are solely creatures of statute, a federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute." *United States v. Aleynikov*, 676 F.3d 71, 75-76 (2d Cir. 2012).  "An indictment that fails to allege the essential elements of the crime charged offends both the Fifth and Sixth Amendments."

---

[1] Unless otherwise noted, citations include emphasis but omit quotation marks, footnotes, and alterations in the original source.

*United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000).  When an element is implicit in the statute, rather than explicit, the indictment must nonetheless allege that element explicitly.  *See id.* at 93; *United States v. Serrano*, 191 F. Supp. 3d 287, 290 (S.D.N.Y. 2016).  A defendant who "objects to the indictment before trial…is entitled to a more exacting review of the indictment than one who waits until after trial to object."  *Pirro*, 212 F.3d at 92.

The Fifth and Sixth Amendments require "some amount of factual particularity" in the indictment "to ensure that the prosecution will not fill in elements of its case with facts other than those considered by the grand jury," and to ensure that the defendant is "informed of the nature and cause of the accusation against him."  *Id.*  Thus, where the offense includes generic terms, the indictment cannot simply track the language of the statute; it must allege facts that show that the conduct was criminal.  *See id.* at 92-93.

## B.    Wire Fraud Requires A Scheme To Obtain Money Or Property

To sustain a wire fraud conviction, the government must prove a "scheme or artifice to defraud, or *for obtaining money or property*" using interstate wires.  18 U.S.C. § 1343 (emphasis added).  The Supreme Court has held that, despite the statute's disjunctive "or" language, fraud statutes contain only one offense:  The "money-or-property requirement" applies to *any* "scheme" prohibited by the mail or wire fraud statutes.  *See, e.g.*, *Ciminelli*, 598 U.S. at 312; *McNally v. United States*, 483 U.S. 350, 360 (1987) (the federal mail and wire fraud statutes are "limited in scope to the protection of property rights.").  Consequently, defendants "violate those laws *only* if an object of their dishonesty was to obtain the [victim's] money or property."  *Kelly v. United States*, 590 U.S. 391, 393 (2020) (emphasis added); *see also id.* at 399 (holding that deceit alone is insufficient—"the deceit must also have had the object of obtaining the [victim's] money or property").  Moreover, obtaining money or property "must play more than some bit

part in a scheme:  It must be an object of the fraud," rather than "an incidental byproduct of the scheme."  *Id.* at 402.

Before *Kelly*, notwithstanding the plain text of the statutes and Supreme Court precedents construing those statutes, the Second Circuit had said that "the mail and wire fraud statutes do not require a defendant to obtain or seek to obtain money or property."  *United States v. Finazzo*, 850 F.3d 94, 107 (2d Cir. 2017).  This description of the law, if it was ever accurate, clearly did not survive *Kelly* and *Ciminelli*.[2]  Indeed, in *Ciminelli*, the Solicitor General conceded "[t]he wire-fraud statute requires the government to show that a fraudulent scheme was designed to obtain money or property."  Brief for the United States at 16, *Ciminelli*, 598 U.S. 306 (No. 21-1170); *see also id.* ("[T]o sustain a conviction for property fraud, money or property must be an object of the fraud.").  Even Justice Alito, who concurred on narrow grounds, concluded in *Ciminelli* that to establish a completed fraud, the government must prove a defendant "conspired *to obtain, and did in fact obtain*, by fraud, a traditional form of property."  *Ciminelli*, 598 U.S. at 318 (emphasis added).

### C.    The Government's "Discretionary Bonus" Allegation Fails To Satisfy The "Obtaining Property" Element Of Wire Fraud

1.    Even accepting the truth of the government's allegation that Smothermon falsified the accounting records of his trading book in 2016, the S-1 still fails to adequately allege a scheme to "obtain" money or property.  The S-1 alleges that "From at least in or about December 2015, up to and including at least in or about September 2016" Smothermon "concealed substantial losses in his trading book…in order to obtain a discretionary bonus to which he would not have been entitled," (Dkt. 96 ¶ 1), *i.e.*, Smothermon lied to ensure that Trammo would

---

[2] A defendant need not actually succeed in obtaining money or property, because the fraud statutes impose inchoate liability for attempts.  Nonetheless, the object of the scheme—whether successful or unsuccessful—must be to obtain money or property.

not decline to pay the bonus he had already earned based on his 2015 performance.  (*See* Dkt. 3 ¶ 8(f)).  Courts have uniformly held, however, that an employee's desire to maintain the compensation that she would be due anyway, absent any deception—such as an existing salary or bonus—cannot satisfy the "obtaining money or property" element of federal fraud.  *See, e.g.*, *United States v. Yates*, 16 F.4th 256, 266-68 (9th Cir. 2021); *United States v. Guertin*, 581 F. Supp. 3d 90, 92-96 (D.D.C. 2022) ("*Guertin*"), *aff'd on related grounds*, 67 F.4th 445; *United States v. Turner*, 465 F.3d 667, 681 (6th Cir. 2006); *United States v. Goodrich*, 871 F.2d 1011, 1013-14 (11th Cir. 1989); *United States v. Tao*, 629 F. Supp. 3d 1083, 1112-14 (D. Kan. 2022); *United States v. Simpson*, No. 3:21-CR-00153, 2023 WL 6247268, at *2 (W.D. La. Sept. 25, 2023).[3]

The plain meaning of the wire fraud statute and Supreme Court precedent confirm that a scheme to "maintain" or preserve a salary or bonus that is already due cannot support a wire fraud conviction.

*First*, the word "obtain" "generally connotes affirmative action to secure something" whereas the "word 'maintain,' by contrast, connotes action to preserve the status quo."  *Guertin*, 581 F. Supp. 3d at 92 (quoting dictionaries and dismissing wire fraud count based on defendant's lie to maintain security clearance for his government job); *see also Tao*, 629 F. Supp. 3d at 1114 (relying on similar reasoning to reject salary maintenance theory of wire fraud and grant Rule 29 motion).  Put another way, the statutory text of the fraud statutes clearly "requires that the 'defendant's scheme sought to gain possession of something not previously in his possession,'"

---

[3] In at least one case the government has moved, post-conviction, to dismiss fraud counts based on a salary-maintenance theory, "in light of recent developments in the law."  Brief for the United States at 45-47, *United States v. Bickers*, No. 22-13174 (11th Cir. June 23, 2023), ECF No. 29.

and maintaining compensation an employee was entitled to anyway does not qualify. *Tao*, 629 F. Supp. 3d at 1114 (quoting *Guertin*, 581 F. Supp. 3d at 92).

 *Second*, the Supreme Court's decisions in *McNally* and *Skilling* preclude the salary-maintenance theory. In *McNally*, the Supreme Court held that the property fraud statutes do not cover schemes to deprive an employer of the intangible right to its employees' "honest services." In dissent, Justice Stevens argued that an employee's breach of loyalty necessarily causes some loss of money to the employer, and that this loss is sufficient to establish the "property" element. 483 U.S. at 377 n.10. The Court, however, necessarily rejected that theory when it held that the employee's breach of duty was insufficient to establish property fraud. *See Goodrich*, 871 F.2d at 1013-14 (rejecting County's "property" interest in officials' salaries and expenses as basis for mail fraud indictment because *McNally* rejected this theory); *see also Turner*, 465 F.3d at 681 ("[T]he salary theory does not fall within the scope of a scheme to obtain money or property.").

 Likewise, in *Skilling*, the Court narrowly construed 18 U.S.C. § 1346, the honest-services-fraud statute enacted after *McNally*. The government's theory was that Skilling had conspired to misrepresent Enron's fiscal health and had "profited from the fraudulent scheme" through "salary and bonuses" and sales of inflated stock. 561 U.S. 358, 413 (2010). The Court rejected that theory, holding that Skilling's conduct was merely a breach of his duty to the company and its shareholders, but not criminal fraud. *Id.*

 "Permitting the government to recharacterize schemes to defraud an employer of one's honest services…as schemes to deprive the employer of a property interest in the employee's continued receipt of a salary would work an impermissible end-run around the Court's holding in *Skilling*." *Yates*, 16 F.4th at 267; *see also United States v. Ochs*, 842 F.2d 515, 527 (1st Cir. 1988) ("[W]e do not think courts are free simply to recharacterize every breach of fiduciary duty

as a financial harm, and thereby to let in through the back door the very prosecution theory that the Supreme Court tossed out the front.").

Put differently, allowing the receipt of an existing salary or a bonus that was already earned to satisfy the property element of the wire fraud statute would "make[] a federal crime of an almost limitless variety of deceptive actions traditionally left to state contract and tort law." *Ciminelli*, 598 U.S. at 315; *see also Guertin II*, 67 F.4th at 451. "If an employee violates § 1343 any time he engages in a fraudulent scheme to keep his job, then *McNally*'s honest-services holding contains an exception so vast it swallows the rule." *Guertin*, 581 F. Supp. 3d at 96. Thus, the government's claim that Smothermon's aim was to prevent Trammo from withholding the compensation he had *already earned* is insufficient to satisfy the property element of the charges.

2.    The lower courts' uniform rejection of the salary-maintenance theory is consistent with the Supreme Court's directive that criminal statutes—especially fraud statutes—be construed narrowly and consistent with the principal of lenity, so as not to "to place under federal superintendence a vast array of conduct traditionally policed by the States." *Ciminelli*, 598 U.S. at 316 (quoting *Cleveland v. United States*, 531 U.S. 12, 27 (2000)); *see also Snyder v. United States*, 144 S. Ct. 1947, 1960 (2024) (Gorsuch, J., concurring) ("[J]udges are bound by the ancient rule of lenity to decide the case as the Court does today, not for the prosecutor but for the presumptively free individual."). The Court has expressed particular concern about allowing federal prosecutors to pursue overbroad theories in the context of alleged employee misconduct, because such theories threaten to "attach criminal penalties to a breathtaking amount of commonplace…activity." *Van Buren v. United States*, 593 U.S. 374, 393 (2021).

Despite these principles, prosecutors have repeatedly pursued novel fraud theories to try to enforce notions of "moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society." *Skilling*, 561 U.S. at 418 (Scalia, J., concurring in the judgment). Time and again the Supreme Court has intervened to halt efforts by prosecutors to evade the narrow bounds of the fraud statutes. *See generally, e.g.*, *Ciminelli*, 598 U.S. 306; *Kelly*, 590 U.S. 391; *Skilling*, 561 U.S. 358; *Cleveland*; 531 U.S. 12; *McNally*, 483 U.S. at 350. Just weeks ago, the Supreme Court granted certiorari to once again decide the validity of another novel theory of fraud invoked by prosecutors. *See Kousisis v. United States*, *cert. granted* (U.S. June 17, 2024) (No. 23-909). This Court should not permit the government to pursue yet another novel theory of fraud here.

3.     The government's allegation that the object of the fraud here was a "discretionary bonus" does not alter the analysis or otherwise salvage the S-1. To be sure, "if an employer offers a raise or a bonus tied to some specific performance metric, an employee who lies *about having achieved that metric* has deprived the employer of something of value." *Yates*, 16 F.4th at 268 (emphasis added). But where an employee earns a bonus that is not calculated based on information the employee "falsified to obtain additional compensation," the bonus is not a proper basis for a wire fraud charge.

The government does not allege that Smothermon lied about any metric that Trammo used to calculate the "discretionary bonus." Instead, it merely alleges that Smothermon "would not have been entitled" to the bonus but for the fraud. (Dkt. 96 ¶ 1). But that allegation does not establish property fraud any more than the allegation that a defendant lied to receive a "salary" that he otherwise "would not have been entitled" to. Merely changing the word "salary" or "paycheck" to "discretionary bonus" does not resuscitate an invalid salary-maintenance theory.

13

*Yates*, the seminal case rejecting the salary-maintenance theory, illustrates the point. There, two bank executives were charged with conspiring to commit bank fraud by concealing the true financial condition of the bank from its board of directors and shareholders.[4]  As it did here, the government initially argued the primary purpose of the fraud was to deprive the bank of "accurate information" about its financial condition.  16 F.4th at 264-45.  The court easily rejected that invalid theory.  *Id.*  The government next argued the defendants had "sought to deprive the bank of their salaries *and bonuses*."  *Id.* at 266 (emphasis added).  It argued that "the board of directors used a performance-based system of compensation; by making the bank's performance appear better than it actually was, [defendants] obtained increased compensation."  *Id.* at 269.  The court rejected that theory as well, because the government had not shown that the defendants had lied about a "specific performance metric" that had been used to calculate their bonuses—they had merely lied to ensure that they would actually be paid the bonuses instead of having them rescinded or getting fired.  *Id.* at 268.

"Permitting the government to recharacterize schemes to defraud an employer of one's honest services—thereby profiting through the receipt of salary *and bonuses*—as schemes to deprive the employer of a property interest in the employee's continued receipt of a salary would work an impermissible end-run around the Court's holding in *Skilling*."  *Id.* at 267 (emphasis added).  Every at-will employee that lies to avoid being fired is lying to receive a paycheck to which he "would not have been entitled" but for deception.  That is all that the government has alleged here, but the salary-maintenance cases hold that such conduct cannot be fraud, lest "a

---

[4] The bank fraud statute, 18 U.S.C. § 1344, like § 1343, requires proof of a scheme to "obtain" money or property of a financial institution.  *See Yates*, 16 F.4th at 264 (applying *Kelly*'s holding that obtaining money or property must be an "object of the fraud").

large swath of everyday workplace misconduct" be swept "within the ambit of the federal fraud statutes." *Guertin II*, 67 F.4th at 451.

### D.    The Government's "Discretionary Bonus" Theory Is Fatally Undermined By Its Own Allegations

Even if a scheme to avoid recission of a bonus that had already been earned was sufficient for fraud, the S-1 would still be defective because all alleged false accounting entries by Smothermon were made *after* he received his 2015 bonus in May 2016. How could a bonus Smothermon obtained *before* his alleged misstatements be the object of those supposed misstatements?

As noted above, *supra* at 4, the government's sworn complaint alleges Smothermon directed employees of the gas subsidiary to make false accounting entries with respect to five LPG contracts. The complaint alleges that the records of the contracts were deceptively altered in July and August 2016 (Dkt. 3 ¶¶ 7(b)(iii); (c)(i-iii); (d)(ii); (e)(ii)), several months after Smothermon received his bonus in May 2016 (*see id.* ¶ 6(b)). The government does not allege Smothermon engaged in any deception in 2015 to inflate his bonus for that year, nor does it allege Trammo had any formal or informal clawback policy under which it could take back a bonus it had already awarded Smothermon.[5]

In response to the return of the S-1, defense counsel requested that the government identify any alleged false statements that occurred *before* May 2016. Although the government informally identified three pre-May 2016 contracts that it apparently alleges were inaccurately

---

[5] Moreover, the evidence will show that Smothermon and Trammo had a contractual agreement regarding the structure of the bonus, which was neither subjective nor "discretionary." Trammo had no legal right to withhold a bonus that had been legitimately earned. In fact, Trammo had previously allowed Smothermon to keep the full amount of his prior year's bonus even where the gas subsidiary's position had become unprofitable during the first or second financial quarters of the next year, before the bonus was paid in May.

entered into the accounting system, any alleged material false statements about those contracts appear to have been made in July and August 2016, consistent with the allegations of the sworn complaint.  (Murphy Decl. ¶ 3).

Thus, even if Trammo could legally have refused to pay Smothermon his bonus after he earned it (and it couldn't), the alleged false accounting did not begin until after Trammo paid the bonus anyway.  Smothermon had no reason to believe his bonus was in danger of being rescinded, because it had already been paid.  In sum, to the extent Smothermon made material misstatements, he could not have done so to deprive Trammo of money.

## II.    THE S-1 DOES NOT RELATE BACK TO THE FILING OF THE ORIGINAL INDICTMENT AND IS THEREFORE UNTIMELY

The S-1 was filed almost eight years after the conclusion of Smothermon's alleged scheme (Dkt. 96 ¶ 1)—well outside the five-year statute of limitations for wire fraud, *see* 18 U.S.C. § 3282.  The S-1's timeliness therefore turns on whether it can "relate back" to the original indictment, filed in May 2019.  A superseding indictment, however, "will relate back to the date of the original amendment *only* if the superseding indictment does not broaden or substantially amend the charges."  *Ben Zvi*, 168 F.3d at 54 (emphasis added).  By (1) amending the indictment to allege a "traditional" property fraud with Smothermon's 2015 bonus as its object in lieu of the right-to-control theory alleged in the original indictment, and (2) pursuing a theory that will necessarily shift the evidentiary focus of the case from false accounting entries that allegedly were made in July and August 2016, to false accounting that supposedly happened prior to May 2016, the government has both "broadened" and "substantially amended the charges."  Thus, to the extent  the Court does not dismiss the S-1 for failing to sufficiently allege wire fraud, it should dismiss because the S-1 does not relate back and is therefore untimely.

### A.    Legal Standard

In determining whether a superseding indictment "materially broadens or amends the original charges," the court will consider whether the superseder alleges "violations of a different statute," contains "different elements," relies on "different evidence," or exposes the defendant to a potentially "greater sentence." *Ben Zvi*, 168 F.3d at 55. "No single factor is determinative; rather, the touchstone of [the court's] analysis is notice." *United States v. Salmonese*, 352 F.3d 608, 622 (2d Cir. 2003).

### B.    The Elements Of The Traditional Property Fraud Alleged In The S-1 Materially Differ From The Original Indictment's Right-To-Control Theory

The fraud alleged in the S-1 has materially "different elements" from the fraud alleged in the original indictment. *Salmonese*, 352 F.3d at 622. Tracking the invalid right-to-control theory of fraud, the original indictment alleged the object of Smothermon's fraud was Trammo's "right to control its assets." (Dkt. 25 ¶ 1). After *Ciminelli* put the right-to-control theory to pasture, the government pivoted to a "traditional" property fraud theory, alleging that Smothermon's bonus was the object of the fraud. (Dkt. 96 ¶ 1).

The government's mid-prosecution revamp of the alleged object of the fraud "cannot be characterized as either trivial or innocuous," or as an "amendment[] as to form but not substance." *Ben Zvi*, 168 F.3d at 54. Nor does the government's new allegation "simply add[] detail to the original charges." *Id.* Rather, the government's prior fraud allegation is profoundly dissimilar from the new one: Under the original indictment, the government would have had to prove that Smothermon's deception deprived Trammo of "potentially valuable economic information." *Ciminelli*, 598 U.S. at 308. Whether or not Smothermon had a personal profit motive for the deception would not have been an element of the crime because information—not money or tangible property—was the alleged object of the fraud. But under the theory alleged in

the S-1, the government will be required to prove "obtaining money or property" as an element of the offense, *i.e.*, that Smothermon's object was to obtain Trammo's money (allegedly in the form of the "discretionary bonus").

It is beside the point that the S-1, like the original indictment, charges wire fraud under 18 U.S.C. § 1343.  For purposes of the statute of limitations, the "'charges' in the superseding indictment are defined not simply by the statute under which the defendant is indicted, but also by the *factual allegations* that the government relies on to show a violation of the statute." *United States v. Italiano*, 894 F.2d 1280, 1282 (11th Cir. 1990) (emphasis added).  By changing the object of the alleged fraud from information to a "discretionary bonus," the government fundamentally altered its factual allegations against Smothermon.  Relation back is, therefore, not permitted.

### C.    The Government's New Theory Of Fraud Will Require New Evidence And Necessitate New Defenses

The government's new fraud allegations will also require both parties to "rely on different evidence" to prove or disprove the facts alleged in the S-1.  *Salmonese*, 352 F.3d at 622. Indeed, the government's mid-stream change in the object of the fraud, necessitated by *Ciminelli*, will drastically alter the evidentiary focus of the case.  For this reason as well, the S-1 does not relate back to the original indictment.

1.    In the buildup to trial on the original indictment, it was clear the focus of the prosecution would be the allegedly false accounting entries Smothermon caused to be made in July and August of 2016, several months *after* Trammo paid him his 2015 bonus in May 2016. Indeed, as discussed *supra* at 4-5, the sworn complaint thoroughly described the government's theory of the case and Smothermon's supposed role, yet the only mismarking referenced therein occurred in July and August of 2016.

18

The government's proposed exhibits for the original trial also indicated that the trial on the original indictment would have focused on false accounting that supposedly occurred in July and August 2016. These exhibits included contracts for the purchase of LPG products; according to the government's theory, Smothermon directed employees to falsely change the terms of these contracts in the accounting system in July and August, not before. (Murphy Decl. ¶ 5). Likewise, the government's proposed exhibits included electronic notes Smothermon allegedly kept which the government contends were Smothermon's reminders to himself to mismark his trades. (*See* Dkt. 3 ¶¶ 7(b)(ii); (c)(iii)). The notes were all written in August 2016. (Murphy Decl. Exs. A-D).

In the context of the fraud alleged in the S-1, however, any mismarking that occurred in July and August 2016 is, if admissible at all, extraneous to the alleged fraud. As discussed, *supra* at 15-16, Smothermon simply could not have mismarked his trading book in July and August of 2016 intending to induce Trammo to pay him a bonus he had already received months earlier. To prove the allegations in the S-1, the Government will need to introduce evidence that Smothermon mismarked his trading book *prior* to May 2016. To date, the Government has not specifically designated any false entries Smothermon allegedly made before May 2016.

2.      In a (failed) effort to sufficiently allege the "obtaining money or property" element, the government necessarily had to include in the S-1 the allegation that Smothermon's bonus was "discretionary" and that "he would not have been entitled to the bonus" absent the fraud. (Dkt. 96 ¶ 1). That allegation, which was not in the original indictment and was at most an afterthought in the complaint, materially expands the scope of the case.

As noted, *supra* at 15 n.5, the defense vigorously disputes that Smothermon's bonus was discretionary. But the issue—whether Trammo was contractually obligated to pay or could

withhold the bonus in its discretion—was largely irrelevant in the context of the right-to-control theory alleged in the original indictment. Under the S-1, however, that question is critical to both the prosecution and defense and will likely dominate the jury's focus. It will also be proven or disproven based on documentary evidence and testimony (as well as potential expert analysis) that would not have been necessary in the context of the allegations in the original indictment.

If Trammo was contractually obligated to pay Smothermon the bonus, as the defense intends to prove, then Trammo had no legal ability to rescind the bonus once Smothermon had earned it based on the gas subsidiary's 2015 profits. As a result, any alleged mismarking in 2016 would be irrelevant, because it could not have been done with the intent to deprive Trammo of money. On the other hand, if the bonus was discretionary, as the S-1 claims, then mismarking that occurred in the period between the end of 2015 and the time Smothermon received the bonus in May 2016 could—theoretically—have been intended to prevent Trammo from diminishing or rescinding the 2015 bonus, *i.e.*, to obtain Trammo's money.

The S-1 will require Smothermon to build a new defense based in part on proving the bonus was not discretionary and could not be rescinded or clawed back. The evidence needed to establish Trammo's contractual obligation to pay will likely include (1) documents and testimony regarding Smothermon's conversations with Trammo officials about compensation; (2) documents and testimony regarding Trammo's decade-long history of auditing, calculating, and paying Smothermon's bonus—including paying the bonus during periods when the gas subsidiary's trading book was in the red; (3) expert testimony on contract law relating to employee compensation; and (4) expert testimony about industry norms for bonus pay. In essence, the S-1 has changed this case to one of contract law, with the consequence that any trial will inevitably include substantial new evidence from both sides.

\*    \*    \*

"[N]otice is the touchstone in deciding whether a superseding indictment substantially changes the original charges." *United States v. Gengo*, 808 F.2d 1, 3 (2d Cir. 1986); *see also Ben Zvi*, 168 F.3d at 55. The S-1 materially alters the case in ways Smothermon could not have reasonably anticipated when the original indictment was returned more than five years ago. The original indictment did not apprise him that a critical allegation in the case against him would be the claim that the object of his fraud was a "discretionary bonus" Trammo could allegedly rescind at its convenience. Requiring Smothermon to defend against that allegation now, when key evidence necessary to do so is likely no longer available, would contravene the policy underlying all statutes of limitations: "to protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment because of acts in the far distant past." *United States v. Panebianco*, 543 F.2d 447, 454 n.6 (2d Cir. 1976).

## III.    IN THE ALTERNATIVE, THE CASE SHOULD BE ADJOURNED PENDING THE SUPREME COURT'S DECISION IN *KOUSISIS*

If this Court does not dismiss the S-1, it should adjourn all proceedings in the case pending the outcome of *Kousisis v. United States*, because the Supreme Court's decision in that case may have a significant impact on the viability of government's theory here.

*Kousisis* is another case in which prosecutors sought to stretch the bounds of the wire fraud statute using a novel theory. *Kousisis* involved defendants who lied about minority business certification to obtain government construction contracts for repairs. *United States v. Kousisis*, 82 F.4th 230, 233-35 (3d Cir. 2023). The defendants argued they were not guilty of fraud because the victim, a government agency, had received the full benefit of the bargain—that is, it "received the repairs it paid for" at the price promised. *Id.* at 240. Thus, the defendants

21

argued, the only thing the victim was deprived of was information that, if disclosed, would have caused the agency to either rescind the contract or not award it to the defendants in the first place. The Third Circuit rejected that argument. Applying the "fraudulent-inducement" theory, it held that the victim's payment of funds under the contract satisfied the "obtaining money or property" element of fraud, even if the victim would have paid the same amount (or more) and received the same work absent the fraud. *Id.* at 240.

On June 17, 2024, the Supreme Court granted certiorari in *Kousisis* to decide the validity of the fraudulent-inducement doctrine. The first question presented is "Whether deception to induce a commercial exchange can constitute mail or wire fraud, even if inflicting economic harm on the alleged victim was not the object of the scheme."

As was the case with *Ciminelli*, the question presented by *Kousisis* has clear relevance to this case. A decision reaffirming that fraud requires an intended economic harm to the victim, which is not proven when the defendant merely induces an exchange the victim would have avoided but for the fraud, would fatally undermine the government's theory here. That theory— at bottom—amounts to a claim that even if Smothermon fairly earned his bonus based on performance in 2015, Trammo would have declined to pay if it had known about the gas subsidiary's true financial performance in 2016 (even though 2016 performance was not a factor used to calculate the 2015 bonus). Conversely, if the Supreme Court holds fraudulent inducement is a valid theory of fraud, then the government will only need to show that Smothermon's alleged deception induced Trammo to enter a monetary exchange it would have otherwise avoided. A decision along those lines could even, hypothetically, revive the salary-maintenance theory that has been rejected by the courts.

22

Thus, the Supreme Court's decision could either obviate the need for trial or materially alter the contours of the evidence and arguments the parties will present.  It is in the interests of justice and judicial economy for this Court to adjourn all proceedings in this action until the Supreme Court rules in *Kousisis*, which should be no later than June 2025.

## <u>CONCLUSION</u>

The Court should dismiss the superseding indictment or, in the alternative, hold the case in abeyance pending the Supreme Court's resolution of *Kousisis v. United States*.

Dated:   July 19, 2024
          New York, New York                         Respectfully submitted,


                                                      /s/ Alexandra A.E. Shapiro
                                                      Alexandra A.E. Shapiro
                                                      Daniel J. O'Neill
                                                      Avery D. Medjuck
                                                      SHAPIRO ARATO BACH LLP
                                                      1140 Avenue of the Americas, 17th Floor
                                                      New York, New York 10036
                                                      (212) 257-4880
                                                      ashapiro@shapiroarato.com
                                                      doneill@shapiroarato.com
                                                      amedjuck@shapiroarato.com

                                                      George D. Murphy, Jr. (admitted *pro hac vice*)
                                                      GEORGE D. MURPHY, JR.
                                                      1001 Fannin, Suite 2450
                                                      Houston, Texas 77002
                                                      (713) 658-1960
                                                      george@georgemurphylawyer.com

                                                      Terry W. Yates (admitted *pro hac vice*)
                                                      YATES AND ASSOCIATES
                                                      2502 Algerian Way
                                                      Houston, Texas 77098
                                                      (713) 861-3100
                                                      tyates@yateslawoffices.com

                                                      *Attorneys for Defendant David Smothermon*