United States District Court
Southern District of New York

---------------------------------------------------------

United States of America

                              19-cr-382 (AKH)

      -against-


David Smothermon,

                   Defendant.

---------------------------------------------------------


## DAVID SMOTHERMON'S SENTENCING MEMORANDUM


**STEPTOE LLP**
717 Texas Avenue, Suite 2800
Houston, Texas 77002
Tel.: 713.221.2300

David Isaak
Julia Gatto
Drew Harris

***COUNSEL FOR DAVID SMOTHERMON***

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 3

I.   DAVID SMOTHERMON IS A MAN OF STRONG CHARACTER WHO,
     UNDER EXTRAORDINARY PERSONAL AND PROFESSIONAL
     PRESSURES, COMMITTED THE OFFENSE-CONDUCT. ............................... 6

     A. Background ........................................................................................... 6

     B. David Smothermon Builds an Impressive Career at Trammo. ...................... 8

     C. David Smothermon Is an Admired and Charitable Community
        Member. ................................................................................................. 9

     D. David is a Devoted Father and Irreplaceable Caregiver to Carson. ............... 12

     E. The Offense-Conduct Within the Context of Personal and Professional
        Pressures ............................................................................................... 17

     F. Since his Offense Nearly Ten Years Ago, David Has Worked to Repair
        the Harm and Move Positively Forward Under Difficult Circumstances. ......... 22

II.  BASED ON DAVID'S EXTRAORDINARY INDIVIDUAL
     CIRCUMSTANCES AND THE APPLICABLE LAW, THE COURT
     SHOULD IMPOSE A NON-CUSTODIAL SENTENCE
     INCORPORATING SIGNIFICANTLY PUNITIVE CONDITIONS OF
     PROBATION. ........................................................................................... 26

     A. The Parties' Stipulated Advisory Guidelines Range is Correctly
        Calculated. ............................................................................................. 27

     B. The Advisory Guidelines, Whatever Their Calculation, Should Carry
        Minimal Weight in Determining David's Sentence. ..................................... 31

     C. The § 3553(a) Sentencing Factors Support a Non-Custodial Sentence
        with Conditions. ...................................................................................... 34

CONCLUSION ................................................................................................ 38

CERTIFICATE OF SERVICE .............................................................................. 38

**INTRODUCTION**

At his core, David Smothermon, 55, is a caretaker. To his immediate family, David is their rock. David is married to Angie, the love of his life, for more than 30 years. When she was diagnosed with Stage IV B-cell lymphoma last year, he was, as he always has been, her source of strength and support. David and Angie have a 26-year-old son, Carson. Carson has cerebral palsy, lives with his parents, and relies on them for his daily needs. David meets those needs—physical, financial, and emotional—with enduring devotion. He also serves a similar role to his aging parents. When David's father began experiencing rapid cognitive decline, David became one of his father's primary caregivers and an emotional crutch and caretaker for his mother, responsibilities he continues to shoulder selflessly today.

David's generosity extends far beyond his immediate family. The many attached letters of support describe, in moving detail, the countless ways David has uplifted, mentored, and stood by friends, colleagues, and community members over the years. Those who know him best speak of a man whose compassion, loyalty, and quiet generosity have touched their lives in significant and lasting ways.[1]

David's offense is a sobering reminder that even good men can make grave mistakes. After living admirably for decades, David stumbled in his late-40s. By then, he had built a successful career as an energy-sector trader, the last ten years of which David had spent at Trammo, Inc., where he had rightfully earned a

---

[1] Per the Southern District of New York's, "Notice Regarding Privacy and Public Access to Electronic Civil and Criminal Case Files," information related to Mr. Smothermon's and his family member's "medical records, treatment, and diagnosis," have been redacted from the publicly filed document. We have sent the Court and opposing copy a copy of the unredacted filing.

reputation for his work ethic and integrity. He also was successful. Year after year, David's trading skills generated substantial profits for himself, his team and the firm.

But in 2016, David's record of success faltered. For the first time in years, David's trades produced losses—losses that threatened not only the sizeable bonus he had earned in 2015, but also something far more personal: his deeply held self-image as a provider. For David, his bonus was more than a paycheck. It symbolized his ability to care for his family, friends, work colleagues, and community. The weight of that responsibility was especially heavy in 2016, as Carson's physical and emotional health sharply declined. At the same time and relatedly, David, who had long struggled with depression and anxiety, was also mentally spiraling and increasingly relying on alcohol and substances to cope.

Under this strain, and without the emotional capacity to fully acknowledge his losses, David convinced himself they were temporary. He believed that with just a little more time, his trading book would recover. It was in this mindset that David, an otherwise principled man who knows right from wrong, committed the offense conduct, purposefully concealing his 2016 Quarter-1 losses from Trammo and collecting his 2015 bonus based on misrepresentations regarding his trading record. Notably, in a career defined by more than two decades of honesty and accomplishments, the misconduct that now overshadows his professional legacy and threatens his family's stability was confined to a brief period.

David has accepted full responsibility for his wrongdoing and recognizes that there must be consequences. Even before sentencing, he and his family have already endured some of those repercussions, including deep shame, reputational damage, financial consequences, and, most significantly, emotional turmoil driven by the uncertainty of their futures.

David has also already begun the hard work of making amends. Shortly after his guilty plea, David paid $8 million in restitution directly to Trammo. He has also put in place a financial plan to ensure that the remaining balance will be paid as quickly as possible. David has also consented, as part of his plea agreement, to repay interest owed to Trammo, which was calculated favorably for Trammo, on top of the value of the bonus payment.

In parallel, David is confronting long-neglected personal challenges, including depression, anxiety, and substance abuse. These struggles contributed to his aberrational lapse in judgment, and his ongoing efforts to address them are central to moving positively forward.

Nonetheless, David understands that further penalties must and will be imposed by this Court. The advisory Federal Sentencing Guidelines' recommendation of several years in prison, however, is far too harsh and fails to account for the full breadth of David's history and characteristics and the nature and circumstances of his offense.[2]  In light of these factors, we respectfully ask that

---

[2] As noted in the Presentence Report, the government and David object to the Probation Department's calculation of the Federal Sentencing Guidelines. While the Probation Department acknowledges that David's individualized circumstances warrant a significant downward variance from the advisory Guidelines—nearly a 40% reduction from the bottom

the Court impose a non-custodial sentence that, instead of prison, includes meaningful and punitive alternatives to incarceration, including a lengthy term of probation (five years), mandated substance abuse and mental health treatment, community service (200 hours), and a substantial period of home confinement (ten months). As detailed below, such a sentence is "sufficient, but not greater than necessary" to serve the purposes and goals of sentencing. 18 U.S.C. § 3553(a).

## I. DAVID SMOTHERMON IS A MAN OF STRONG CHARACTER WHO, UNDER EXTRAORDINARY PERSONAL AND PROFESSIONAL PRESSURES, COMMITTED THE OFFENSE-CONDUCT.

### A. Background

David Smothermon was born and raised in Texas. His father worked as an engineer for NASA, and his mother was a homemaker. Together, they raised David and his sister, Lori, in a middle-class home, grounded in love, faith, and support. This year, David's parents celebrated 70 years of marriage. After graduating from high school in Friendswood, Texas, David attended Stephen F. Austin State University in Nacogdoches, Texas, from where he earned a bachelor's degree. By far the most significant moment of his college career was when, in his junior year, he met Angela Lee Austin, "Angie." They were immediately drawn to each other, sharing similar backgrounds, a common faith, strong family values, and aligned hopes for the future. In 1994, after a two-year courtship, they married.

---

of Probation Department's incorrectly calculated range—its starting point is flawed, resulting in an inflated offense level. Because both calculations—the objected-to Probation Department calculation and the agreed-upon calculation in the parties' plea agreement— still recommend a substantial term of incarceration, the Court should, regardless of which Guidelines are adopted, vary under the § 3553(a) factors to impose a non-carceral sentence.

In 1998, David earned a master's degree in finance from the University of St. Thomas in Houston, Texas. Having worked since his teenage years, he continued to work throughout college and while pursuing his graduate degree. During this time, he and Angie also began building their family, welcoming their son, Carson, in 1999. Six months after his complicated and premature birth, Carson was diagnosed with cerebral palsy. Angie quit her job as a social worker to care for Carson full-time.

At 29, David was the father of a child with a serious disability and the sole provider for his young family — responsibilities he met with unwavering resolve. When Ernst & Young laid him off while Carson was in the NICU, David set aside his dream of becoming a commodities trader and took a job selling mobile homes to keep his family afloat. By 2000, David was able to enter the energy sector, first as an analyst and later as a trader with Duke Energy Merchants in Houston. In 2002, he was invited to open and lead the Houston office of Trafigura, a UK-headquartered energy trading company. The role was both prestigious and rewarding, providing a salary that supported his growing family, but it required frequent travel. By then, David and Angie were focused on raising their young son, and David wanted to remain closer to home. In 2005, he accepted a position with Trammo Gas, a Houston subsidiary of Trammo, Inc., a privately held international trading and logistics company.

In accepting the Trammo offer, David turned down a more lucrative position at a competitor because Trammo was sensitive to David's unique family obligations

and assured him the flexibility he needed to remain available for then-six-year-old Carson, who already had had two surgeries for strabismus and a major surgery to lengthen his heel cords and release his hamstrings. The latter surgery was extremely difficult, leaving Carson in a wheelchair for weeks and delaying his start to kindergarten by a full school year. He began receiving Botox injections at age 3 for muscle relaxation and pain relief, injections he continues to receive to this day. Like every family with a seriously disabled child, the Smothermons' world revolved around therapy appointments and doctor's visits. Worry about Carson's overall development, pain, and future were never far from their minds.

### B.    David Smothermon Builds an Impressive Career at Trammo.

When David joined Trammo Gas, he was one of only three executives in leadership. Tragically, within his first five years at the company, the other two executives, David Blosser and John Hinsey, both close friends and mentors of David's, passed away within several months of each other. At just 41 years old, David, now promoted to President, found himself leading the division alone. By all accounts, he rose to the challenge.

One of David's proudest achievements was cultivating a warm, hospitable, and supportive workplace culture. In her attached letter, Sandra Reed, a long-term Trammo employee whom David promoted to office manager, describes one powerful example of his workplace compassion. She recalls the moment David learned she was being abused by her husband:

Dave called me into his office and talked to me. I broke down. He
asked me how he could help me and what I needed to do to move.
Dave told me that he couldn't let me go through this alone. He
told me that everybody needs help. I told him that I needed a
deposit for a condo and I had furniture on layaway, He paid for
everything—the deposit and the furniture.
(Exhibit 1, Letter from Sandra Reed).

Under David's leadership, Trammo Gas transformed from a fledgling division

into one of Trammo, Inc.'s most important profit centers. While other divisions

struggled financially, David's portfolio continued to grow, consistently

outperforming competitors in the sector. Although not required, David generously

shared his profits with his entire Houston team, often recommending sizeable

bonuses to his colleagues that organization leadership felt were too high. (Exhibit 2,

Letter from David Herr.) David, regardless, advocated for them. David's success

was theirs, as well.

### C.    David Smothermon Is an Admired and Charitable Community Member.

While David built his professional career, he was equally devoted to

nurturing and supporting his community, his friends, and his family, especially his

beloved son, Carson.

Angie and David have lived in the Houston neighborhood of Clear Lake,

Texas for more than 20 years, 8 short miles from David's childhood home where his

mother still lives. They sent Carson to Clear Lake's diverse local public schools,

where most of his classmates came from families with significantly fewer financial

resources than the Smothermons with almost 30% of students receiving free or reduced-price lunch.

Throughout Carson's school years, and continuing even after his graduation, the Smothermons have devoted substantial financial and emotional support to Clear Lake's schools and students. In their moving letter to the Court, Dave's neighborhood friends provide a glimpse into David's immeasurable contributions to his community, describing his involvement in the PTA, his generous investments of time and money in youth athletic programs, and his efforts to educate young people about the dangers of drinking and driving. (Exhibit 3, Letter from the Lenzes, Koerners, and Frenches).

David has also selflessly extended professional mentorship, including to Jason Daly and John Amato. Jason and John recall how David began simply as a supportive customer—"genuinely interested in the stories of their staff" and "leav[ing] generous tips to help employees"—before becoming their mentor and financial backer in building a successful group of restaurants. Jason explains that, because of David's involvement, he, John, and their families "benefited greatly by being able to reap the financial success of our business far sooner—or perhaps never at all—had Dave not been involved." (Exhibit 4, Letter from Jason Daly). John likewise credits the success of his career, and the financial stability it brought to his family, directly to David's guidance and support. (Exhibit 5, Letter from John Amato). *See also* Letter from Stephen Brown, Exhibit 6 (detailing how David

provided financial backing and invaluable business advice, enabling Stephen's business to help small business owners thrive).

David's caretaking nature is reflected in the way he cares for his 88-year-old mother, Nancy. With David's father Jim in memory care and now in hospice care, David checks in on Nancy every day and helps take care of her daily needs, whether that be helping her pay bills or attending to car and home repairs. (Exhibit 7, Nancy Smothermon Letter).

Stories of David's charity and compassion—both great and small—fill the attached letters. They recount moments such as David: paying for legal representation for the general manager of Jason Daly and John Amato's first restaurant after he was arrested (Exhibit 8, Letter from Javier Hernandez); covering rent and other bills for wait staff unable to work during COVID (Exhibit 5; Letter from John Amato)l making frequent blood donations (*id.*); funding a church project to build homes in Honduras (*id.*); providing both manual labor and financial assistance to families whose homes were destroyed in Hurricane Harvey even when his own home had been flooded (Exhibit 9, Letter from Kevin Lenz); coordinating volunteer events at Carson's elementary school (Exhibit 3, Letter from the Lenzes, Koerners, and Frenches); standing up for women colleagues who were being harassed by senior male staff (Exhibit 10, Letter from Paul Therrien); paying for a Trammo employee's car repair (*id.*); acting as a surrogate parent to a close friend's teenage daughter after her mother died from cancer and ensuring she finished high school (Exhibit 11, Letter from Reese Weldon); advocating for inclusivity and pay

equity at Trammo (Exhibit 1, Letter from Sandra Reed); paying for the funeral of a high school friend's wife when the friend lacked the means (Exhibit 12, Letter from Troy Barringer); helping another widowed friend reorganize family finances and stabilize the household budget (Exhibit 6, Letter from Stephen Brown); helping a family in distress, including buying them a new air conditioning unit in the sweltering Texas summer (Exhibit 21, Letter from Suzi Hanks); helping a grieving family by tending to his friend's business affairs after the friend's sudden passing (Exhibit 22, Letter from Pat Mikhail); and providing a home for his nephew after he finished high school (Exhibit 23, Letter from Conner Calloway).

Most often, David performs his acts of charity quietly and anonymously, asking for nothing in return. As his best friend Kevin Lenz observed, "throughout [David's] 55 years on this earth, he has given to the world much more than he has received." (Exhibit 9, Letter from Kevin Lenz).

### D. David is a Devoted Father and Irreplaceable Caregiver to Carson.

As simply stated by John Amato—and echoed throughout the other letters—David "puts people first." (Exhibit 5). At the very top of that list is David's beloved son, Carson. In nearly every letter submitted, friends, family, and neighbors describe David's unconditional love, patience, and relentless advocacy for Carson.



David is far more than a caring parent—he is Carson's anchor, protector, champion, and indispensable source of strength. Time and again, in the attached letters, those in the Smothermon orbit describe David as Carson's "best friend." But David is more than a companion—he is Carson's lifeline. Carson says it best, "my father is not only my greatest support. He is my rock, my caregiver, and my constant presence as I live with the daily challenges of cerebral palsy. … He knows my struggles intimately, and our bond, especially over the past decade, has become irreplaceable." (Exhibit 13, Letter from Carson Smothermon).

In a particularly powerful anecdote, one of Carson's childhood friends, Paige Koerner, articulates the positive impact David has had in shaping Carson's accomplishments and success. Ms. Koerner is an occupational therapy student. During a clinical rotation in the neonatal intensive care unit, she cared for a newborn with cerebral palsy. The experience immediately brought Carson to mind. As she writes: [r]ather than immediately considering [the baby's] potential

limitations, I thought optimistically, 'Well, hopefully he'll have parents like Angie and Dave." (Exhibit 14, Letter from Paige Koerner and Cameron Koerner).

With cerebral palsy, Carson suffers from significant gross and fine motor skill deficits. Over the years, the Smothermons have developed creative strategies to help preserve Carson's independence and autonomy: for example, choosing clothing without zippers or buttons, using adaptive utensils for meals, and living in a home carefully modified to reduce the risk of falls. Yet despite these efforts, there are



moments when even the smallest tasks become insurmountable. When Carson was young, both Angie and David shared in meeting these challenges. Though they could have afforded to hire a full-time caregiver to help with Carson's care, the Smothermons chose not to do so and to care for him themselves. (Exhibit 15, Angie Smothermon Letter.) But as Carson grew into adulthood, it was often only his father who could step in in ways that preserved Carson's dignity and affirmed his sense of manhood. David's support is deeply personal and often intimate: he helps Carson shave (as captured in the photo above), ties his bow tie for special occasions, and assists with physical tasks requiring strength, precision, or coordination.

David's commitment to Carson extends well beyond meeting his physical needs; he is equally devoted to fostering Carson's social engagement and sense of

belonging. As Carson's peers have moved on to teenage and young adult rites of passage like dating, learning to drive, and attending school away from home, many of these experiences have been delayed or remain out of reach for Carson. David works tirelessly to bridge those gaps, creating opportunities that strengthen Carson's confidence and connection to others. An example of this was when Carson coached a youth basketball team with David's friend Kevin Lenz. When some of Carson's players couldn't afford the fees, David would quietly pay them. (Exhibit 13, Letter from Carson Smothermon.)

A friend recalls a particularly memorable vignette that occurred during a family vacation. Carson was sitting on a lounge chair watching his friends racing down a waterslide. Sensing that Carson might be left out, David took a golf cart out with Carson and spent the day trying to find license plates from every state. As David's friend, Dr. Brian Schaulin recalls, "in this seemingly small moment, Dave showed how powerful a father's love and attention can be." (Exhibit 16, Dr. Brian Schaulin Letter).

More recently, David has given Carson a meaningful, adapted role in the family business, providing him with both purpose and identity. And like many fathers and sons, they share a love of sports. For them, this shared passion carries even greater weight—rituals of watching and attending games are protective and grounding, easing Carson's feelings of isolation and reinforcing that he is an integral part of his family and community. David's involvement in Carson's life

gives him a sense of meaning and purpose and removing David from his life would leave a tremendous void.

By far, David's most emotionally tolling—but profoundly important—role comes when Carson experiences "flares." These frequent episodes, marked by intense pain, physical immobility, and emotional collapse, can last for days or even weeks. During these times, Carson's ability to function independently is severely compromised. He may be unable to get out of bed, attend therapy, or even communicate clearly due to cognitive fog and overwhelming fatigue. It is in these moments that David's presence becomes not just helpful, but essential. David stays up with Carson through the night, monitoring his safety, helping him manage pain, and offering emotional support when despair takes over. ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████

Finally, David's caregiving is not only intensely therapeutic; it is also practical. David manages the complex and often overwhelming logistics of Carson's mental and physical health care, which include quarterly Botox injections, physical therapy, mental health counseling, and orthopedic appointments. David's role requires coordinating a vast network of healthcare providers, navigating insurance claims, scheduling and attending appointments across multiple specialties, and maintaining ongoing communication with numerous third-party professionals. Carson, who lives with significant physical impairments, simply cannot manage

these responsibilities on his own. And while Angie is a devoted mother, the scope and intricacy of Carson's care—built over years of David's hands-on involvement—is so extensive that even she could not seamlessly assume this role.

### E.    The Offense-Conduct Within the Context of Personal and Professional Pressures

As acknowledged during his guilty plea, in the first quarter of 2016, David mismarked his book to understate his trading losses. Accounting rules require that trading positions be valued according to market prices. This practice of "marking the book" ensures that a company's books accurately represent a value of a trading position. David directed others in his organization to mark the book at values that showed his book breaking even or losing a small amount of money when, in fact, his book was losing tens of millions of dollars. While this deviation from a life well-lived cannot be excused, it can be explained by the enormous personal and professional pressures weighing on David in 2016.

As articulated by one former colleague of David's, "the commodity trading business is a very a high pressured, high stress environment."  As he explains:

> While all employment in the U.S. is generally 'at will,' trading houses frequently remind their traders that one wrong move is all it takes to lose their job. Over time that stress can wear a person down, straining marriages, and family relationships. Traders often develop alcohol or drug dependencies, have extra marital affairs or engage in other self destructive behavior to cope with the stress.
> (Exhibit 18, Letter from Timothy Essaye).

Throughout his career, David navigated the intense demands of his professional responsibilities while meeting the unique challenges of his home life.

To those on the outside, he appeared to maintain that balance, and in many ways, he did, though it was always a fragile one. In 2016, however, a convergence of events shattered that equilibrium.



In 2016—Carson's sophomore and junior years of high school—the Smothermon family faced one of its most trying periods. The year before he started high school, Carson underwent surgery intended to increase his mobility, help alleviate his relentless pain, and allow him more independence. His difficult and painful recovery, exacerbated by the physical demands of navigating a large high school, consumed his freshman and sophomore year. By summer of 2016, however, it became clear for the first time after the surgery that not only was the surgery a failure, but Carson's mobility and pain were worse than before.  For the upcoming school year, the Smothermons had no choice but to transition Carson to a hybrid homeschool program.

The disappointment and overwhelming reality of it all plunged Carson — and his parents — into a profound depression. By then, Carson's enduring challenges made it painfully clear that, despite his parents' best efforts, he might never be able to live an independent adult life. The prospect that Carson might not go away to college, live on his own, or hold a traditional job weighed heavily on them. Questions they never wanted to ask began to surface: Would Carson ever date or marry? Have children? Be able to support himself? And most haunting of all —

what would happen to Carson when they were gone? With his chronic pain, the future felt uncertain and frightening. Parents of children with disabilities experience higher levels of stress than other parents,[3] and this was certainly true of David in 2016. Carson's struggles were tearing him apart.

At the same time that Carson was struggling the most, Angie was also caring for a dear friend, Jolie Weldon, who was battling a terminal colon cancer to which she succumbed in September of 2016. Jolie's illness and death weighed heavily on Dave, who was also close to her, and it left David as Carson's sole caregiver, as Angie cared for Jolie and her daughter Reese.

In his attached letter, Carson eloquently reflects on the toll this period took on not only himself, but also his father:

> I wanted to be normal. … It was so difficult for me. Now I know my parents were struggling just as much watching me suffer and deal with some of the limitations of my cerebral palsy.
>
> I remember the year so well. I was struggling physically and emotionally, but it was also the first time I saw my dad struggle with his mental health. He was more withdrawn and just not his normal full of life self. I knew my dad loved me, but I didn't understand what was going on with him. Now I do.
> (Exhibit 13, Letter from Carson Smothermon).

Compounding David's emotional burden, his beloved father, Jim, was diagnosed with dementia in December 2015 and his cognitive functioning rapidly declined. David was very close to his father. When David was younger, Jim coached

---

[3] See *Yun-Ju Hsiao, Parental Stress in Families of Children with Disabilities*, 53 INTERVENTION IN SCH. & CLINIC 201 (2018), https://doi.org/10.1177/1053451217712956.

all of David's little league baseball and basketball teams. As David grew older, Jim

became his trusted counselor and sounding board and everything in between.

(Exhibit 19, Dustin & Lori Calloway Letter); (Exhibit 7, Nancy Smothermon Letter).

Now, not only did David have to help his mother and sister in finding adequate care

for his father, but he had to deal with a deep and profound loss as his father was

unable to offer his wise counsel and unparalleled support. The emotional toll on

David of watching his father fade—while simultaneously managing Carson's

worsening health and providing support for Angie as she cared for Joeli—was

immense.

     All this time, the pressures at work were mounting. After David's book had a

banner 2015, earning over $63 million, David's bosses at Trammo expected him to

repeat the same successes. In January 2016, Trammo appointed David to its board

of directors. This promotion showed the growing importance of the gas trading

division to Trammo. As many of Trammo's other divisions floundered, the company

was increasingly reliant on David to continue his trading success (Exhibit 2, David

Herr Letter).

     Under the immense weight of these family and work pressures, David's own

longstanding battle with ██████████████████████████████

██████ became particularly acute. Colleagues and family could not ignore his

frayed mental state. He would show up to work disheveled and with unkempt hair.

(Exhibit 25, Durham Report at 5.). To cope, David increasingly turned to alcohol

and pills, including Adderall and Ambien, which he took nearly every day and

night. David's drinking also escalated, often beginning at lunch and continuing into the evening. But the combination of drugs and alcohol didn't help. David wasn't sleeping and he was on the verge of a breakdown. (*Id.*)

Against this backdrop, the pressures of work felt even more crushing. After years of success in trading and a particularly profitable 2015, in 2016 David's trades started losing money. Although David's book posted a $63 million profit in 2015, by March 2016 David's trades were losing millions of dollars, leading Trammo's clearing broker, Societe General, to call for Trammo to post nearly $48 million to cover margin calls to cover unrealized losses. As David recalls, "I was working harder and lost more money. I felt inadequate. I was a mess and not thinking clearly. It felt like I was screaming for someone to get me a life preserver." (Exhibit 25, Durham Report at 5).

By then, the company and his immediate team depended on David's success. A poor 2016 would affect his colleagues as much as it would affect him. David's mounting losses also jeopardized his own and his team's sizable 2015 bonuses. Although Trammo normally paid bonuses using a formula based on the prior year's profits, Trammo did not pay bonuses until May 31 of the following year and retained discretion to reduce or deny them altogether. For David, that bonus represented far more than a paycheck. At a time when his home life felt increasingly out of his control, it was a means of ensuring that Carson would be supported for the rest of his life. Attempting to rationalize mismarking his book, David convinced himself—based on years of experience navigating the volatile

energy market—that many of his losing trades would rebound and turn profitable by year's end.[4]

Driven by his role as a provider and his conviction that the trades would recover and with his judgment clouded by his own spiraling depression and substance abuse, the stress of Carson's worsening condition, and his father's struggle with dementia, David crossed a line he thought he would never cross. After a long career and life of doing the right thing and living as an upstanding member of the community, David made a horrible choice for which he is now paying a painful price. To quote David's friend and right-hand man at Trammo, David Herr, "This was beyond shocking to me. Dave was so trustworthy and honest and so heartfelt that for him to make these decisions just didn't make sense." (Exhibit 2, Letter from David Herr.).

### F.    Since his Offense Nearly Ten Years Ago, David Has Worked to Repair the Harm and Move Positively Forward Under Difficult Circumstances.

David committed the offense nearly a decade ago and has lived under indictment for the past seven years. During that time, the Smothermons have continued to face the kinds of extraordinary highs and painful lows that their unique family unit has grown accustomed to celebrating and enduring *together*.

---

[4] David was not entirely wrong. By the end of 2016, most of the positions Trammo exited after uncovering David's valuation errors had, in fact, rebounded and become profitable. (Exhibit 2, Letter from David Herr).  Likewise, the claim that David's mismarking of his book led Trammo to lay off 200 employees is questionable. Trammo made the business decision to shutter its gas trading division, and its other divisions consistently underperformed. (*Id.*)

In the immediate aftermath of the discovery of his offense and his arrest, David's deep depression continued. He struggled with overwhelming guilt and shame not only for betraying Trammo, a company he valued and to whom he had given ten years of his professional life—but also for jeopardizing the stability of his employees and most importantly his cherished family.

In those first years, unable to manage the emotion of it all, he continued to turn to alcohol to cope with his nearly overwhelming emotions. ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████

     ████████████████████████████████████████████████

████████  ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

---

[5] David has discontinued his drug use to comply with his bond conditions. While the drug use has discontinued, the underlying conditions since his arrest that led to it remain untreated.



As the uncertainty of the criminal matter hung heavily over the Smothermon family,[7] 2024 brought another blow. In September, Angie received what she accurately describes in her attached letter as a "devastating" diagnosis. After several years of unexplained physical struggles, doctors identified the cause: Stage IV non-Hodgkin's Lymphoma, an incurable cancer. Angie immediately underwent surgery to remove a mass from her small intestine and began aggressive radiation treatments. Angie beautifully explains David's role in her care:

> From that moment on Dave never left my side. He attended every appointment, test, and treatment, consulted with doctors, researched every option, and made sure I received the best care possible. All the while, he continued to care for Carson and manage our household without missing a beat. He was my rock, caring for both me and our son with unwavering strength. (Exhibit 15, Letter from Angie Smothermon).

As Angie endured months of medical treatments, David and his family lived under the constant strain of his unresolved criminal case. Then, in the midst of this already difficult period, David learned that his former attorney had failed to act on a deferred prosecution offer from the U.S. Attorney's Office—an opportunity now lost. By then, after years of self-reflection and profound remorse, David had no doubt about the seriousness of his actions and had fully accepted responsibility. He wanted to plead guilty and formalize the accountability he had already embraced in his own heart and mind.

Central to David's decision was his commitment to make Trammo whole. Without hesitation, he accepted Trammo's calculation of the value of his bonus and the interest owed.[8] He then took the extraordinary and voluntary step of making a substantial upfront restitution payment. Just two weeks after entering his guilty plea, David paid $8,000,000 in restitution. Determined to repay the remaining $11.5 million David has developed a payment plan and schedule, with the goal of fully

---

[8] It is not clear what basis the government used for its calculation of the pre-judgment interest rate. Had interest been calculated based on the one-year treasury rate, it would have been $4,926,205 less than what David agreed to pay. David, therefore, agreed to pay considerably more interest than he otherwise might have had to pay.

restoring Trammo as soon as possible.[9] To carry out this plan, David plans to take out a $300,000 loan on his life insurance policy and to refurbish and bring to market two properties, one in Galveston, Texas and the other in Cabo, Mexico by the end of 2026, which he believes will net him roughly $5 million. After that, David plans to pay over a significant portion of his business income (which he estimates as between $400,000 and $500,000 a year) to pay off his restitution obligation.

## II. BASED ON DAVID'S EXTRAORDINARY INDIVIDUAL CIRCUMSTANCES AND THE APPLICABLE LAW, THE COURT SHOULD IMPOSE A NON-CUSTODIAL SENTENCE INCORPORATING SIGNIFICANTLY PUNITIVE CONDITIONS OF PROBATION.

"A sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *United States v. Cavera,* 550 F.3d 180, 188 (2d Cir. 2008) (en banc). This discretion must be exercised in light of the factors set forth in 18 U.S.C. § 3553(a), which require a sentence tailored to the unique facts and circumstances of the case. *See United States v. Booker*, 543 U.S. 220, 245–46 (2005); *Gall v. United States*, 553 U.S. 38, 59 (2007).

---

[9] David has also agreed in the plea agreement to a $11,600,000 forfeiture money judgment. While a forfeiture judgment is separate from restitution, the forfeiture statute allows DOJ, though its Money Laundering and Asset Recovery Section, to apply funds recovered through forfeiture to an outstanding criminal restitution award. *See* 18 U.S.C. § 981(e); *see also* Sharon Cohen Levin & Seetha Ramachandran, 21 Fed. Sent. R. 10, 19-20 (Oct. 2013). This ensures that when, as here, the defendant has limited funds to pay restitution, that the victim (here, Trammo) receives those funds. While DOJ has discretion as to whether forfeiture funds will be applied to a restitution judgment, we ask the Court to recommend that any forfeiture payments be characterized as restitution.

While the advisory Federal Sentencing Guidelines are a factor to be considered, they are only one among several statutory factors. The remaining § 3553(a) considerations—including the nature and circumstances of the offense and the history and characteristics of the offender; the need for the sentence imposed to provide just punishment, deterrence, and needed educational and vocational training; the need to avoid unwarranted sentence disparities among similarly situated defendants; and the need to provide restitution—require a highly individualized assessment of the person standing before the Court.

As a result, "[t]he Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Nelson v. United States*, 129 S. Ct. 890, 892 (2009) (emphasis in original).

### A.    The Parties' Stipulated Advisory Guidelines Range is Correctly Calculated.

Nonetheless, the Supreme Court has instructed that every sentencing determination begin with a correct Guidelines calculation. *Gall*, 552 U.S. at 49. Here, the correctly calculated range is the range stipulated by the parties in the plea agreement, not the range calculated by the Probation Office in the PSR.

The Guidelines calculation in the plea agreement was based on the parties' shared understanding that David has no criminal history points.  Despite the parties' agreement, the Probation Office would impose a criminal history point for David's 2013 nolo contendere plea to a Texas misdemeanor, Obstructing Highway or Other Passageway (Texas Penal Code § 42.03).  Although the criminal history point would not change David's criminal history category, it would render unavailable

USSG § 4C1.1's zero-point offender adjustment, increasing the offense level by 2. *See* Final PSR , Dkt. 128, at 9-10.

Probation's approach is wrong: David should not be assigned a criminal history point for his prior plea to Obstructing Highway.  Under USSG § 4A1.2(c)(1), a sentence for a misdemeanor does not result in the imposition of a criminal history point as long as, among other conditions not disputed here, the prior offense is "similar to" any of a number of listed offenses.  Among the offenses listed by Guidelines § 4A1.2(c)(1) is Reckless Driving, which is "similar to" Obstructing Highway.  Accordingly, the prior sentence should be excluded from the calculation of criminal history points.

The Second Circuit has adopted a broad "common sense approach" to assessing similarity under § 4A1.2(c), focusing on whether the prior offense was "categorically more serious" than the listed comparator offense.  *United States v. Martinez-Santos*, 184 F.3d 196, 200, 206 (2d Cir. 1999).  Applying that approach here, it is clear that the prior Obstructing Highway offense is not "categorically more serious" than Reckless Driving.

*First*, while Reckless Driving is punishable by a term of confinement in county jail of up to 30 days, David was sentenced to no term of incarceration for the Obstructing Highway offense; instead, he was sentenced to 9 months of probation and 30 hours of community service.  Tex. Transp. Code § 545.401; *see also Martinez-Santos*, 184 F.3d at 205 (approving comparison of "punishments imposed for the listed and unlisted offenses," and "the perceived seriousness of the offense as

indicated by the level of punishment" to determine similarity of listed and unlisted offenses).

*Second*, the underlying charge to which David pleaded does not suggest any greater "level of culpability" or "likelihood of recurring criminal conduct" than a reckless driving offense. *Id.* David pleaded nolo contendere to a charge that he "without legal privilege or authority, intentionally, knowingly, or recklessly obstruct[ed] a highway and/or street to which the public or a substantial group of the public had access, by: blocking a roadway." (Exhibit 28, Ordering Amending Information). That description suggests a *lower* level of culpability than that required under Texas's Reckless Driving statute. And in general, the Obstructing Highway statute can be violated by conduct suggesting a very low degree of culpability and a low likelihood of recurring criminal conduct. For instance, the Obstructing Highway statute has been held to apply to a person "blocking traffic as an act of political protest," *Singleton v. Darby*, 609 Fed. Appx. 190, 193 (5th Cir. 2015), or "blocking one lane of traffic on a busy day," such that "[c]ars had to stop . . . and then wait to move over into the next lane in order to pass," *Lauderback v. State*, 789 S.W.2d 343, 346 (Tex. App.—Fort Worth 1990, pet. ref'd). No risk of danger to others is required.

The Reckless Driving statute, meanwhile, is violated only "if [a] person drives a vehicle in *wilful or wanton disregard for the safety of persons or property*." Tex. Transp. Code §545.401 (emphasis added); *see, e.g.*, *United States v. Raney*, 633 F.3d 385, 391 (5th Circ. 2011) (holding the evidence *insufficient* for Reckless Driving

where defendant crossed into oncoming lane of traffic because there was no testimony concerning the risk that the defendant could have hit someone); *Reyna v. State*, No. 07-24-00241-CR, 2025 WL 655896, at *2 (Tex. App.—Amarillo Feb. 27, 2025, no pet. h.) (trial court could reasonably conclude that "driving at 90 mph on an access road with a posted speed limit of 50 mph" could constitute reckless driving); *Fore v. State*, No. 12-19-00376-CR, 2020 WL 5406271, at *2 (Tex. App.—Tyler Sept. 9, 2020, no pet.) ("pickup truck spinning in circles or 'doing donuts'" constituted reckless driving).

The Probation Office asks the Court to look past David's plea and focus on the initial charge against him, based on a police report and the initial information. But the Second Circuit has repeatedly held that a sentencing court may not rely on the unreliable in determining what his "actual conduct" was, specifically holding that police reports and pre-sentence reports "are not judicial records and may not be used to find facts about the prior conviction." *United States v. Rood*, 679 F.3d 95, 99 n.7 (2d Cir. 2012), *abrogated on other grounds by Descamps v. United States*, 570 U.S. 254 (2013); *see also United States v. Gregory*, No. 24-2978-cr, 2025 WL 1202074, at *2 (2d Cir. April. 25, 2025) (summary order) ("[T]he evidentiary standards used for arrests are insufficient to prove a fact relied upon at sentencing. . . . [A]n arrest cannot be used to prove criminal conduct for sentencing purposes (due to a lack of evidentiary rigor)."). Here, the Court may rely only on the description of David's conduct contained in the documents related to his plea, which he and the prosecutors agreed to and the Texas court accepted: the Order Amending

Information (Exhibit 28) and the Nolo Contendere Plea (Exhibit 29), each dated December 2, 2013. Those documents reveal that David blocked a roadway.

Because David's prior nolo contendere plea to Obstructing Highway is not categorically more serious than Reckless Driving, the imposition of a criminal history point is improper, and the plea agreement correctly calculated the offense level to be 26, which leads to an advisory guidelines range of 63-78 months.

### B. The Advisory Guidelines, Whatever Their Calculation, Should Carry Minimal Weight in Determining David's Sentence.

Regardless of the Guidelines range ultimately adopted, the Court should afford it little—if any—weight in determining the appropriate sentence for David. As applied here, either Guidelines' calculation yields an unduly harsh result that ignores the individualized facts of David's case—including, among others, his vital role in supporting and caring for his disabled son, wife, and aging parents; his charitable contributions to his community; the mitigating circumstances surrounding his commission of the offense; his profound remorse and commitment to full restitution; and the unlikelihood of recidivism.

Instead, the Guidelines are driven nearly exclusively by one factor: the loss amount, calculated here as the size of David's bonus based on legitimately booked trading profits from 2015. Under the plea agreement, that figure alone accounts for 20 points of the total offense level of 26.[10]

---

[10] Under the Probation Department's calculation, loss amount accounts for 20 of its calculated total offense level of 28.

As the Second Circuit and numerous judges have long recognized, because U.S.S.G. § 2B1.1 relies so heavily on loss amount—an imprecise and wholly imperfect measurement of culpability—they deserve far less deference than other Guidelines provisions that are grounded in more sound policy rationale. *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016) ("Where the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence."); *see also United States v. Adelson,* 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (loss calculation can produce a "travesty of justice" due to U.S.S.G. § 2B1.1's "fetish with abstract arithmetic."); *United States v. Tanner*, 17 Cr. 61 (LAP) (describing the fraud Guideline's singular focus on loss as "patently unfair"), ECF No. 214; *United States v. Johnson,* 2018 WL 1997975, at *3 (E.D.N.Y. Apr. 27, 2018) (loss-enhancement numbers "do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime."); *United States v. Prosperi,* 686 F.3d 32, 50 (1st Cir. 2012) (affirming non-custodial sentence in 87-108 month Guidelines case involving a nine-year fraud scheme, observing that the lower court had properly "explained why the estimated loss amount was an unfair proxy for culpability, and why it should not drive the sentencing process.").

Here, especially, the "loss"—David's bonus that, but for his misconduct in early 2016, he otherwise had earned—does not meaningfully reflect the nature or seriousness of his offense. There is no dispute that, in a normal year, David would

have received his 2015 bonus based solely on his 2015 performance. But by covering up his 2016 losses, David deprived Trammo of the ability to exercise its discretion and deny the award in light of the later losses. This conduct is categorically different from the typical fraud or theft where the defendant takes something to which they have no legitimate claim. None of this is offered to minimize the egregiousness of David's conduct or to dispute the causal link between his misrepresentations and the financial harm to Trammo. Rather, the unique facts of this case illustrate why rigid, loss-driven calculations under § 2B1.1, divorced from the offense's specific context, can overstate culpability and misguide the sentencing process.

Given the well-recognized shortcomings of § 2B1.1 in general, and the particular problems with relying so heavily on loss in this case, this Court—as many others in this District and across the country have done—should either discount the advisory Guidelines entirely or, at a minimum, give them little weight, placing greater reliance on the other statutory factors in § 3553(a). As Judge Garaufis observed in *Johnson*, in order to "take seriously [the] responsibility under Supreme Court and Second Circuit precedent to determine an independently 'reasonable' sentence based on an 'individualized application of the statutory sentencing factors,'" "it is appropriate for [a sentencing court] to rely more heavily on the § 3553 factors."

### C.     The § 3553(a) Sentencing Factors Support a Non-Custodial Sentence with Conditions.

Independent of the Guidelines, therefore, the Court must determine what sentence sufficiently, *without being greater than necessary,* accomplishes the sentencing objectives of 18 U.S.C. § 3553; namely, promoting deterrence, incapacitation, and punishment; ensuring restitution to the victims; providing for a defendant's individual needs; and avoiding unwarranted sentencing disparities.

Not all criminal convictions should or need to result in prison sentences. In fact, when Congress created the federal Sentencing Guidelines in 1984, it expressed the notion that first offenders who commit non-violent and otherwise less serious offenses, like David, should *not* receive prison sentences. *See* 28 U.S.C. § 994(j). David—whose offense, although serious, was brief, aberrational, and committed under extraordinary personal and professional strain—is one such offender.

David's offense must be viewed in the context of a life otherwise marked by integrity, generosity, and service. "And how could it be otherwise, for on this day of judgment, must not one judge the man as a whole?" *United States v. Gupta,* 904 F. Supp. 2d 349, 354 (S.D.N.Y. 2012). The letters submitted to the Court paint a portrait of a man who has consistently placed others before himself—whether serving as the primary caregiver and emotional support system to his disabled son, Carson, and wife, Angie, who is battling Stage IV cancer, and mother and father (now in memory and hospice care), supporting his community, or mentoring entrepreneurs. These acts are not isolated; they are the defining features of David's

character and should be paramount in this Court's determination of the appropriate sentence.

David is not seeking leniency without accountability. Rather, he is asking for a non-custodial sentence that includes rigorous and significantly punitive conditions of probation, including a lengthy term of home confinement, substantial community service, and mandated mental health treatment. Such a sentence imposes real and tangible restrictions on his liberty. *See Gall*, 552 U.S. at 48 (acknowledging that a non-custodial sentence, even those without conditions, is punishment; "probation is not merely 'letting an offender off easily.'") (citations omitted).

Moreover, the sentence imposed by this Court is far from the only consequence David will face for his misconduct. Even before sentencing, he—and, most painfully, his family—have endured substantial repercussions. Now a felon, David will carry all the stigma and legal restrictions that accompany such a conviction—a penalty that, notably, the government itself once deemed not entirely necessary when it offered a deferred prosecution. He also has physically and mentally suffered. As David's friend Kevin Lenz poignantly observed, "I know technically a prison has bars and walls, but over the last 9+ years Dave has lived in an emotional prison with stress, sadness, and depression acting as his bars." (Exhibit 9, Letter from Kevin Lenz). When assessing whether a sentence is appropriately punitive, the Court should consider these collateral effects as part of the overall sanction. *See United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009)

("It is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence.").

Nor does David's requested sentence undermine general deterrence. Courts have repeatedly rejected the notion that non-custodial sentences in white-collar cases send the wrong message. *See, e.g., United States v. Tomko*, 562 F.3d 558, 573 (3d Cir. 2009) (rejecting government's argument that district court's probationary sentence in complex securities fraud case would harm general deterrence). In fact, the stigma of a felony conviction, the reputational damage, and the emotional toll David has endured over nearly a decade are themselves powerful deterrents.

A prison sentence is also unnecessary to specifically deter David. He has demonstrated profound remorse, taken extraordinary steps to make restitution—including an $8 million payment shortly after pleading guilty—and committed himself to never again jeopardizing his family's security or his integrity. He poses no risk of recidivism.

A non-custodial sentence would not create unwarranted disparities. Courts in this District and across the country have routinely imposed probationary sentences in white-collar cases involving comparable or even greater loss amounts, particularly where defendants have accepted responsibility, made restitution, and presented compelling personal circumstances. *See, e.g., Prosperi*, 686 F.3d at 50, *United States v. Phillips,* 1:22-CR-00138-LJL (S.D.N.Y. June 25, 2024) (non-custodial sentence rendered after defendant convicted of two counts of commodities fraud under 7 U.S.C. §§ 9(1), 13(a)(5) with a $20 million loss: guidelines range 78-97

months); *United States v. Black,* 1:16-CR-00370-CM-2 (S.D.N.Y. Oct. 24, 2016) (non-custodial sentence rendered after defendant convicted of conspiracy to commit bank fraud and wire fraud for manipulating the LIBOR index causing worldwide market losses of roughly $500 million; guidelines range was 108 to 135 months);

The sentencing statute also calls for consideration of the defendant's medical and mental health needs and the ability to address them effectively. 18 U.S.C. § 3553(a)(2)(D). David has taken meaningful steps to engage in treatment for longstanding mental health challenges, ████████████████████████ ████████████████████ These efforts are best supported in the community, where he has access to consistent providers and a stable support system. Incarceration would disrupt this progress. Another factor under the statutory regime is the "need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7). Here, incarceration would make David's efforts to make Trammo whole through restitution more difficult.

Finally, and perhaps most critically, the requested sentence also considers the profound and immeasurable impact David's absence will have on his family, especially on Carson. His role as Carson's caregiver is irreplaceable. As Carson's therapist, Alicia Neeley, LPC, explains, David's presence is "a central component of [Carson's] safety plan, his continuity of care, and his capacity to remain engaged in life." (Ex. 17, Letter from Alicia Neely, LPC.) Removing him from the home would not only destabilize Carson's physical and emotional health—it would also

jeopardize Angie's health and the fragile equilibrium of a family already stretched to its limits.

## CONCLUSION

Based on all the foregoing and in appeal to this Court's mercy and compassion, we respectfully urge the Court to impose a sentence of five years' probation, ten months' home detention, 200 hours of community service, and mandated mental health and substance abuse treatment.

David and his family thank the Court for its consideration.

Respectfully submitted,


*/s/ David Isaak*
David Isaak
Julia Gatto
Drew Harris

**STEPTOE LLP**
717 Texas Avenue, Suite 2800
Houston, TX 77002
Tel.: 713.221.2300

***COUNSEL FOR DAVID SMOTHERMON***

## CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2025, I caused a copy of the foregoing document to be served via ECF on counsel of record.

*/s/ David Isaak*
David Isaak